1  Daryl L. Binkley, Esq. (SBN 254326)
2  LAW OFFICE OF DARYL L. BINKLEY
3  77564 Country Club Dr., Ste. 246
   Palm Desert, CA 92211
4  (760) 862-1100 (t)
5  (760) 862-1106 (f)

6  Attorney for Plaintiffs PANAGIOTIS THEODOROPOULOS, et. al.

7
8  UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA

9

10  PANAGIOTIS THEODOROPOULOS, an
    individual; dba ELIKI OLIVE OIL, ELIKI
11  OLIVE OIL, LLC, a California Limited
12  Liability Company; dba ALIKI'S GREEK
    TAVERNA
13
              Plaintiffs,
14
         vs.
15  COUNTY OF LOS ANGELES; BOARD
16  OF SUPERVISORS OF LOS ANGELES
    COUNTY, JONATHAN FIELDING,
17  ANGELO BELLOMO, PATRICIA
    JOCAS, JACQUELINE TAYLOR
18  TERRANCE POWELL, BRENDA
19  LOPEZ, SCOTT ABBOTT, NWAMAKA
20  ORANUSI, LETAUN COLE COTTON,
    GRACELINE SHIN, CAROLYN
21  WATSON, OBI OGAMBA, MARIA
22  KHRADJIAN, VERNY GRAJEDA,
    JAMES DANIEL, IFEOMA NDUPU,
23  ZIAD ASKAR, JANGBIR SINGH,
24  MARISTELLA YAMBAO, MAXINE
25  GARBUTT FORD, RIO ENRIQUEZ
    ANYAYAHAN, JOSHUA
26  TRAPESONIAN, all individuals; and
27  DOES 1 through 10, inclusive,
            Defendants.
28

Case No.:

**COMPLAINT FOR:**

 *1.* Violation of 18 U.S.C. § 1962 (c)
 *2.* Violation of 18 U.S.C. § 1962 (d)
 *3.* Violation of 18 U.S.C. § 1346
 *4.* Fraud
 *5.* Breach of Fiduciary Duty
 *6.* Trespass to Chattels
 *7.* Unjust Enrichment
 *8.* Violation of 42 U.S.C. §198N3
 *9.* California Code of Civil Procedure
      § 526a
 10. Civil Conspiracy

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

NATURE OF ACTION....................................................................1

INTRODUCTION..........................................................................1

PARTIES AND RELEVANT NON-PARTIES.................................56

Plaintiffs...................................................................................56

Defendant COUNTY....................................................................57

Defendant BOARD OF SUPERVISORS OF LOS ANGELES COUNTY.............57

RICO Defendants........................................................................58

Non-Party Co-Conspirators............................................................71

SUBJECT MATTER JURISDICTION AND VENUE.........................114

JOINT LIABILITY......................................................................115

FACTS COMMON TO ALL CAUSES OF ACTION.........................115

A.   Background.......................................................................115

B.   Defendants Engage in a Pattern and Practice of Extortion of Plaintiffs' Farmers' Market Operations...................................................117

C.   Defendants Engage in a Pattern of Deception and Fraudulent Concealment of their Racketeering Activities.............................................279

  1. Misleading and Threatening Statements by GRAJEDA and ORANOUSI...279

  2. July 7, 2006 Misleading and Falsified Letter by FIELDING to COUNTY BOS Requesting Approval to Amend LACC Title 8 and Increase EH Fees Despite the presence of Surpluses in the EH S7K Fund...............................291

  3. December 3, 2008 Letter by FIELDING to COUNTY Auditor-Controller Regarding DPH Fiscal Review...............................................306

  4. April 12, 2011 Misleading and Falsified Letter by FIELDING to COUNTY BOS in Support of Approval of an Ordinance to Amend LACC Title 8 and

Increase Overall Fees Collected by EH in the presence of Budget Surpluses and Extensive Misappropriation of Funds..................................................310

5. April 16, 2012 Misleading and Falsified Letter by FUJIOKA to COUNTY BOS in an Attempt to Cover Up the Criminal Activities of the Enterprise...473

D. Defendants Engage in a Pattern of Illegally Increasing EH Fees in the presence of Large Budget Surpluses and in a Pattern of Holding Large Sums of Excess Monies in the EH S7K Trust Fund Illegally..........................633

E. RICO Defendants Engage in a Pattern of Fraud through the Distribution of Excess Surplus Funds present in the EH S7K Trust Fund among Themselves through Expedited Staff Transfers and Promotions and through Substantially Increased Overtime Pay, Other Pay and Employee Benefits that were Issued Specifically to the RICO Defendants for the Sole Purpose of the Depletion of Excess Surplus Funds that Belong to Plaintiffs and other Businesses.......................................................................................651

F. Defendants Engage in a Pattern of Licensing and Protection of Illegal Farmers' Market Vendors in Exchange for the Payment of Excessive EH Fees without Questions by these Vendors................................................673

G. Defendant County Supervisors Fail to Adequately Supervise DPH and EH which Leads to the Creation of the EH Criminal RICO Enterprise..............697

H. After Plaintiffs Complained about Highly Excessive Fees and Corrupt Conduct by Defendants, Defendants Engage in a Campaign of Harassment and Intimidation of Plaintiffs' Farmers' Market Stands and in Direct Retaliation against THEODOROPOULOS in an Effort to Silence him and Continue their Scheme of Extortion and to Prevent Defendants' Scheme to Extort Plaintiffs from Being Exposed.......................................................................708

I. After Plaintiffs Complained about Highly Excessive Fees and Corrupt Conduct By Defendants, Defendants Engage in a Campaign to Harm the Reputation and Business of Plaintiffs' Restaurant and in Direct Retaliation

1   against THEODOROPOULOS in an Effort to Silence him and Continue Their
2   Scheme of Extortion and to Prevent Defendants' Scheme to Extort Plaintiffs
3   from Being Exposed...................................................................743

4   J.   Defendants Falsely Arrest and Imprison THEODOROPOULOS for a Week
5   based on Arrest Warrants Procured by Fraudulent, Sham, Trumped-Up and
6   Retaliatory Criminal Charges....................................................748

7   K.   Defendants COUNTY and COUNTY BOS Engage in a Pattern of Collusion
8   and Complicity with RICO Defendant FIELDING for the Misappropriation of
9   Millions of Dollars of Environmental Health Related Revenue..............757

10  L.   Defendants Engage in a Pattern of Misappropriation of Millions of Dollars
11  from the Environmental Health S7K Trust Fund and from Environmental
12  Health Related Revenue..........................................................769

13  M.   Defendants Engage in a Pattern of Presentation of Falsified Documents in
14  Support of a Sweeping Amendment to LACC Title 8 for the Purpose to
15  Substantially and Fraudulently Increase Overall Fees Collected by
16  Environmental Health.............................................................794

17  N.   Defendants Engage in a Pattern of Continued Extortion of Plaintiffs' Farmers'
18  Market Stands and Restaurant Operations.....................................803

19  O.   Defendants Engage in a Pattern of Obstruction of Justice by Withholding
20  Exculpatory Evidence, Corrupting the Judicial System and Interfering and
21  Colluding with Plaintiffs' Criminal Defense Attorneys.........................805

22  P.   RICO Defendant FIELDING Donates Fifty Million U.S. Dollars to UCLA
23  School of Public Health Allegedly out of Private Funds Four Months after
24  Approximately $51.5 Million of EH Related Funds from EH Related Revenue
25  and from Funds present in the EH S7K Trust Fund that FIELDING
26  Administers were Commingled with Defendant COUNTY Accounts........814

27  Q.   Defendants COUNTY, COUNTY BOS and FIELDING are Sued by the
28  LACoAEHS for Breach of Fiduciary Duty.....................................824

CLAIMS FOR RELIEF...................................................................840

    FIRST CLAIM FOR RELIEF

    (Violation of RICO, 18 U.S.C. § 1962 (c))..................................840

    SECOND CLAIM FOR RELIEF

    (Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962 (d))..............982

    THIRD CLAIM FOR RELIEF

    (Multiple Instances of Honest Services Fraud,

    Violation of 18 U.S.C. 1346).............................................986

    FOURTH CLAIM FOR RELIEF

    (Fraud)...................................................................994

    FIFTH CLAIM FOR RELIEF

    (Breach of Fiduciary Duty)................................................998

    SIXTH CLAIM FOR RELIEF

    (Trespass to Chattels)...................................................1001

    SEVENTH CLAIM FOR RELIEF

    (Unjust Enrichment).....................................................1006

    EIGHTH CLAIM FOR RELIEF

    (Violation of 42 U.S.C. § 1983)..........................................1008

    NINTH CLAIM FOR RELIEF

    (Illegal Expenditure of Funds –

    California Code of Civil Procedure Section 526(a)).......................1015

    TENTH CLAIM FOR RELIEF

    (Civil Conspiracy).......................................................1020

PRAYER FOR RELIEF...................................................................1022

## NATURE OF ACTION

1.     Plaintiffs          PANAGIOTIS          THEODOROPOULOS ("THEODOROPOULOS") dba ELIKI OLIVE OIL and ELIKI OLIVE OIL, LLC ("ELIKI") dba ALIKI'S GREEK TAVERNA (collectively hereinafter referred to as "Plaintiffs") bring this Complaint against the COUNTY OF LOS ANGELES (hereinafter referred to as "COUNTY"), the BOARD OF SUPERVISORS OF THE COUNTY OF LOS ANGELES (collectively hereinafter referred to as "COUNTY BOS") and JONATHAN FIELDING ("FIELDING"), ANGELO BELLOMO ("BELLOMO"), PATRICIA JOCAS ("JOKAS"), JACQUELINE TAYLOR ("TAYLOR"), TERRANCE POWELL ("POWELL"), BRENDA LOPEZ ("LOPEZ"), SCOTT ABBOTT ("ABBOTT"), NWAMAKA ORANUSI ("ORANUSI"), LETAUN COLE COTTON ("COTTON"), GRACELINE SHIN ("SHIN"), CAROLYN WATSON ("WATSON"), OBI OGAMBA ("OGAMBA"), MARIA KHRADJIAN ("KHRADJIAN"), VERNY GRAJEDA ("GRAJEDA") , JAMES DANIEL ("DANIEL"), IFEOMA NDUPU ("NDUPU"), ZIAD ASKAR ("ASKAR"), JANGBIR SINGH ("SINGH"), MARISTELLA YAMBAO ("YAMBAO"), MAXINE GARBUTT FORD ("FORD"), RIO ENRIQUEZ ANYAYAHAN ("ANYAYAHAN"), JOSHUA TRAPESONIAN ("TRAPESONIAN"), (collectively hereinafter referred to as "Defendants"), all individuals except COUNTY, and DOES 1 through 10, inclusive seeking, among other things, statutory and compensatory damages arising out of Defendants' violations of Plaintiffs' rights under federal and state law, injunctive relief precluding Defendants from the further extortion of Plaintiffs, and related equitable relief. Plaintiffs for their Complaint against the Defendants allege as follows:

## INTRODUCTION

2.     Over the course of several years, Defendant Verny Grajeda and his co-defendants and co-conspirators have sought to extort, instill fear into, harass,

intimidate, retaliate against, economically harm, and otherwise tortuously injure Plaintiffs Panagiotis THEODOROPOULOS,  dba Eliki Olive Oil and his company Eliki Olive Oil LLC, dba Aliki's Greek Taverna and wrongfully arrest and imprison Plaintiff THEODOROPOULOS as a result of his opposition to an elaborate extortion and racketeering scheme that they conceived and fully executed in the United States and particularly in the County of Los Angeles.

3.     This scheme has been carried out by a Los Angeles-based enterprise comprised of, among others, Los Angeles County Environmental Health Department (hereinafter referred to as "EH") inspectors led by GRAJEDA, management officials of the Los Angeles County Department of Public Health (hereinafter referred to as "DPH") led by FIELDING and/or its subdivision the Los Angeles County EH led by BELLOMO.

4.     The Los Angeles County EH inspectors involved include Verny Grajeda, Jangbir Singh, Ziad Askar, James Daniel, Ifeoma Ndupu, Maristella Yambao, Maxine Garbutt Ford, Rio Enriquez Anyayahan and Joshua Trapesonian.  The Los Angeles County DPH and/or Los Angeles County EH management officials involved include Jonathan Fielding, Angelo Bellomo, Terrance Powell, Carolyn Watson, Nwamaka Oranusi, Jacqueline Taylor, LeTaun Cole Cotton, Brenda Lopez, Graceline Shin, Patricia Jocas, Scott Abbott, Obi Ogamba and Maria Kharadjian.  These conspirators are collectively referred to herein as the "RICO Defendants".

5.     The RICO Defendants have received support during the performance of their criminal racketeering activities from Defendants COUNTY and COUNTY BOS. The RICO Defendants were at all times relevant herein agents, employees and/or representatives of Defendant COUNTY and under the direction and control of Defendant COUNTY BOS and at all times mentioned herein were acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant COUNTY.

6.     Their co-conspirators include COUNTY employees such as the COUNTY Chief Operating Officer (hereinafter referred to as "COUNTY CEO") William T. Fujioka, COUNTY Attorney Tate Bejanyan, Assistants to the COUNTY BOS Salya Mohamedy, Yolanda Vera and Steve Napolitano, Auditor-Controller employees Michele Callaghan and Richard Vandenberg, DPH employees such as Jonathan Freedman, Jeremy D. Cortez and Miles Yakota (retired), Environmental Health Quality Assurance Division (hereinafter referred to as "EHQAD") employees such as Gail Morrison, Elena Stephens, Peter Keshishian, Veronica Petrosyan, and Ellen Ruelas, EH employees Kenneth Murray, Dolores Chavez, Babak Tamjid, Victor Abdelmalak, David Chun, Behdis Bagheri, Iduve Hernandez, Okey Nwachuku, Reginio Hough, Robert Creviston, Elvira Tanedo, William Ross, Kimberly Kennedy Anderson Harris and Tor Ree Jones, Los Angeles Deputy City Attorney David Sheppard and Los Angeles City Attorneys Carmen Trutanich and Mike Feuer, a business entity named MGT of America Inc. and employees of that corporation such as Brad Burgers and others that participated directly or indirectly in a fraudulent Fee Study that was used by DPH and EH management during 2011 to justify changes in EH fees.

7.     The enterprise's goal is to improperly use the official regulatory authority entrusted to EH by the state of California to inspect restaurants, farmers' market vendors, and other food-related businesses in order to induce the payment of extortionate fees and to generate in this illegal manner as much revenue as possible for the segregated EH S7K Trust Fund (hereinafter referred to as "S7K Fund" or "S7K Trust Fund"), and in extension, for the Defendants themselves that are employed by EH and are paid directly from this segregated S7K Fund.

8.     As a result of Plaintiff THEODOROPOULOS' opposition to these illegal practices, the RICO Defendants have sought to inflict maximum damage to Plaintiffs' business and reputation, to put personal psychological pressure on Plaintiff THEODOROPOULOS and his family, to disrupt Plaintiffs' business, to harass them

1   and intimidate them in an effort to silence THEODOROPOULOS, to imprison him
2   based on fraudulent, sham and retaliatory charges that are devoid of factual and legal
3   basis and to "destroy his company Eliki Olive Oil, LLC" by "singling him out"
4   [emphasis added] for relentless "selective prosecution" [emphasis added] among
5   hundreds of farmers' market vendors, many of whom operated illegally and under the
6   protection of the RICO Defendants in exchange for the payment of extortionate fees
7   and at the detriment to public health and public interest.

8       9.     As a result, in addition to the extortion and racketeering scheme, the
9   RICO Defendants engaged in a relentless retaliation campaign against Plaintiffs that
10  started well before year 2008, that peaked during year 2008 and that continued
11  through years 2011, 2012 and to the present.

12      10.    In 1994, the Los Angeles County Association of Environmental Health
13  Specialists and a taxpayer filed a lawsuit in the Los Angeles Superior Court against
14  the COUNTY BOS alleging the mismanagement and misappropriation of fees in
15  connection with the County's health inspection program (the predecessor to EH).
16  That case was *Amjadi v. Board of Supervisors*, LASC Case No. BC 110446. The
17  case resulted in a finding that the COUNTY was inappropriately allocating to the
18  County's general fund moneys that should have been used solely for the health
19  inspection program. A judgement was issued by the Los Angeles Superior Court on
20  May 12, 1999 which ordered $10,890,608 in EH fees collected from the issuance of
21  health permits and licenses and improperly commingled by Defendant COUNTY
22  with County's general fund moneys to be deposited into a newly created "segregated"
23  EH S7K Trust Fund and be used solely for the health inspection program, and
24  required that this segregated account be established for the collection and deposit of
25  health inspection fees moving forward (hereinafter the "1999 Court Order"),
26  obviously with the goal of eliminating future misappropriations of this type by
27  Defendant COUNTY.

28

**11.**     This 1999 Court Order resulted in the establishment of the EH S7K Fund for the purpose of segregating all fees that are paid to EH by Los Angeles County businesses and individuals for inspection services.  The primary purpose of the EH S7K Fund is to cover all EH expenses associated with the performance of their regulatory duties and primarily regular EH employee payroll and other expenses such as services and supplies, rent, capital assets, lab costs, overhead and other expenses.

**12.**     EH is required by the California Constitution article XIII A, by California Proposition 26 that was approved on November 2, 2010 by 52.4% of the electorate and amended article XIII A of the California Constitution and went into effect on November 3, 2010, by California Government Code § 66014, by California Health and Safety Code §101325 and §114381(d) and by California Attorney General Opinion 92-506 to limit its regulatory fees to the estimated reasonable costs of providing the services rendered.

**13.**     To effect their plan to improperly use the official regulatory authority entrusted to EH by the state of California to inspect restaurants, farmers' market vendors, and other food-related businesses in order to induce the payment of extortionate fees and to generate in this illegal manner as much revenue as possible for their segregated S7K Fund and for themselves, the RICO Defendants and their co-conspirators engaged in the repeated and continual extortion of Plaintiffs by requiring the payment of inspection fees every three months (quarterly inspection fees) that were multiple times higher than the actual cost of inspection and up to fifty (50) times higher than fees charged by other California Counties for the same inspection service while at the same time engaged in a continual intimidation and harassment campaign against Plaintiffs in order to enforce the payment and collection of these fees, to eliminate dissent and to insure compliance with their unlawful fee policies that had as a goal to extort large sums of money from Plaintiffs with the personal financial gain of the RICO Defendants as a motive, which they did accomplish.

14.     The more Plaintiff THEODOROPOULOS questioned or complained about these very high fees, the more they harassed and intimidated his business operations both at his farmers' market stands and at his restaurant called Aliki's Greek Taverna located at 5862 Arbor Vitae St. los Angeles, CA 90045.

15.     Before 2007 Plaintiff THEODOROPOULOS had repeatedly questioned the appropriateness of these fees but the management of EH defended these fees at all times both through various written communications as well as orally as correct and appropriate and as representative of the actual cost of regulation.   These claims proved to be incorrect and false later on and particularly after July 2011 when the extortion scheme implemented by the RICO Defendants against Plaintiffs started to become exposed.

16.     During late 2007 the EURO/USD ratio was approximately 1.5 which made the importation of food products from Greece expensive for Eliki Olive Oil, LLC.  The fuel was at $4.50 per gallon which resulted in much higher shipping rates, much higher transportation expenses and much higher food prices as well.  Plaintiffs' restaurant was at its beginning stages and had not found its footing yet and therefore the combination of the above factors created financial pressure for Plaintiffs.

17.     As a result of these issues and due to the fact that the total annual fee requirements for Eliki Olive Oil, LLC for the health inspection permits for the farmers' market stands alone had risen after several consecutive fee increases to approximately $13,280.00 per year, Plaintiff THEODOROPOULOS started questioning more intensely these fees during late 2007 and early 2008.

18.     The RICO Defendants both at the DPH and EH management level and at the health inspector level refused again to provide adequate explanations about these very high and extortionate fees despite repeated requests from Plaintiff THEODOROPOULOS.   The RICO Defendants instead attempted to deceive Plaintiffs by claiming that these fees were imposed by the County Supervisors, that

they had nothing to do with the imposition of these fees and that the money from these fees went to Defendant COUNTY.

19.   RICO Defendant NWAMAKA ORANUSI specifically claimed to THEODOROPOULOS and his wife Alice Eddy that the fees were so high because "the COUNTY needed the money" and that "LA COUNTY was different than other California Counties" and that "health inspection fees charged by LA COUNTY should not be compared to those charged by other California counties".

20.   RICO Defendant GRAJEDA during a meeting with THEODOROPOULOS at his Culver City office that took place during late 2007 or early 2008 to specifically discuss the issue of these high and extortionate EH fees tried to deceive THEODOROPOULOS by claiming that the fees imposed on Plaintiffs were the same as those imposed for "carnival concession stand" vendors despite the fact that Plaintiffs have absolutely nothing to do with "carnivals". GRAJEDA also claimed that "EH was the only division of the DPH that was profitable and that some of the money from the revenue collected in the form of EH fees was used to cover expenses in other DPH divisions that were losing money." These claims later proved to be false and pure lies that were intended solely to deceive Plaintiffs and to conceal the criminal activities of the EH RICO enterprise.

21.   GRAJEDA was unable during that meeting to provide to THEODOROPOULOS a legal basis for the very high fees that were imposed on Plaintiffs' business but made every effort to deceive THEODOROULOS.

22.   When GRAJEDA failed to demonstrate a legal basis for these fees THEODOROPOULOS continued during late 2007 and early 2008 with repeated written and oral complaints to EHQAD to GRAJEDA and to GRAJEDA's DPH and EH supervisors about these extremely high EH fees.  During that time and at a meeting at his Culver City Office and after pressured by THEODOROPOULOS about the fees GRAJEDA warned THEODOROPOULOS as follows:

"We charge these high fees because we are the County and we can do it."

"The County has a lot of lawyers on payroll."

"If you continue to complain about the fees, we can charge all [alleged] violations as misdemeanors."

23.     The RICO Defendant campaign of deception continued from 2008 all the way to May of 2011 and to the present.   During the entire period from 2002 that Plaintiffs started working at farmers' markets to May of 2011 the RICO Defendants claimed that they had absolutely nothing to do with the imposition or collection of the health inspection fees, that these fees were determined by the Los Angeles County Supervisors and that the money went to Defendant COUNTY.   GRAJEDA specifically told THEODOROPOULOS that "EH was the only profitable division of the DPH and that the money was partly used to cover loses at other parts of the DPH."   The RICO Defendants carefully and meticulously withheld from Plaintiffs for more than ten years the fact that the monies that they were collecting in the form of these extortionate fees were going directly into "their own" segregated S7K Trust Fund that was established by the 1999 Court Order and that is used to pay their salary, overtime pay, other pay and employee benefits among other EH related expenses.

24.     The phrase "their own" is placed in quotation marks above to signify the fact that this EH S7K Trust Fund was not really owned by the RICO Defendants and that it was not even created by the 1999 Court Order to protect the interests of the RICO Defendants and it was not therefore "their own".   The EH S7K Trust Fund was created by the 1999 Court Order to protect the money paid by Plaintiffs and other local businesses from misappropriation by Defendant COUNTY by holding them "in trust" until used for the inspection of their business.   As a by-product of the creation of the EH S7K Trust Fund however, a direct beneficiary relationship was created between the EH employees, some of whom are named as RICO Defendants in this Complaint, and the funds available in the EH S7K Trust Fund.   This is due to the fact

1  that the majority of the expenditures (approximately 70% to 77%) of the Los Angeles
2  Environmental Health Department are personnel and payroll related.  As a result, a
3  direct-flow beneficiary relationship was created between the RICO Defendants and
4  their co-conspirators that are employed by EH and the funds available in the EH S7K
5  Trust Fund and this relationship was a by-product of the creation of the "segregated"
6  EH S7K Trust Fund itself and particularly of the "segregated" nature of the EH S7K
7  Trust Fund.

8      **25.**    State law however required the RICO Defendants as described in
9  paragraph 12, *supra*, to limit its regulatory fees to the estimated reasonable costs of
10  providing the services rendered.  This was the only safety net that existed for
11  Plaintiffs and that was meant by state law to prevent the RICO Defendants from
12  abusing the regulatory authority that they have over Plaintiffs' businesses in
13  conjunction with the existence of the direct-flow beneficiary relationship that existed
14  between the RICO Defendants and the funds available in the EH S7K Trust Fund to
15  extort Plaintiffs in order to unlawfully enrich themselves.  As it will be shown
16  throughout this Complaint, the RICO Defendants made a conscious and calculated
17  decision and chose to violate state law and to charge Plaintiffs regulatory fees that
18  were at times up fifty times higher than those charged by other California Counties
19  for the same kind of regulation service simply because they believed that "they could
20  do it because they work for the County" and because "the COUNTY has a lot of
21  lawyers on payroll" as GRAJEDA explained to THEODOROPOULOS.  In other
22  words, the RICO Defendants chose to violate state law and to engage in racketeering
23  activities because they believed that they could not be held accountable because they
24  work for Defendant COUNTY.

25      **26.**    The existence of the segregated S7K Trust Fund was first disclosed to
26  Plaintiffs by a letter dated April 12, 2011 written to the Los Angeles County Board of
27  Supervisors by RICO Defendant FIELDING, Exhibit A.  Plaintiffs received access to
28  that later in late April of 2011 or in early May of 2011 right before a May 10, 2011

1  public hearing that was scheduled before the COUNTY BOS for the purpose of the

2  amendment of Los Angeles County Code (hereinafter "LACC") Title 8.

3      **27.**   Throughout the period from 2002 and all the way to April or May of

4  2011, and thereafter, the RICO Defendants made every effort to deceive Plaintiffs

5  about the reasons for the imposition of these extortionate health inspection fees and

6  primarily to withhold the existence of the EH S7K Trust Fund and the fact that they

7  were themselves direct beneficiaries of these rather substantial and illegally induced

8  quarterly fee payments that they demanded and received in the form of EH inspection

9  fees for the operation of Plaintiffs' farmers' market stands. These payments however

10  had nothing to do with EH regulatory fees (i.e. with the actual cost of inspection)

11  because they were at all times multiple times in excess of the actual cost of regulation

12  and everything to do with extortion and with a covert scheme conceived and

13  implemented by the RICO Defendants to improperly use the regulatory authority

14  entrusted to them by the state of California in conjunction with the existence of the

15  segregated EH S7K Trust Fund that provided a direct-flow beneficiary relationship

16  between the RICO Defendants and the funds available in the EH S7K Trust Fund to

17  illegally induce and to actually force Plaintiffs under fear and under threats of

18  prosecution and of economic harm and under color of official right to give up

19  property that did not belong to them according to state law. As a result, the EH

20  criminal RICO enterprise that is described in detail in paragraph 1165, *infra*, was

21  created.

22      **28.**   At the same time, the RICO Defendants engaged in a series of corrupt

23  acts in furtherance of the objectives of the EH criminal RICO enterprise that included

24  the continual extortion of large sums of money from Plaintiffs every three months

25  without legal authority that was at all times enforced through a continual campaign of

26  harassment, intimidation and retaliation that started progressively increasing

27  approximately during April 2004 when the EH fees imposed upon Plaintiffs were

28  sharply raised overnight by the RICO Defendants by 184% and peaked in intensity

during the entire 2008 when the harassment and intimidation of Plaintiffs was practically a daily phenomenon. The extortion, harassment, intimidation and retaliation campaign of the RICO Defendants continued to years 2011, 2012 and to the present time.

29.   Based on a January 26, 2009 Los Angeles County Auditor-Controller Report that details the results of a FY 2007-08 DPH Fiscal Review, Exhibit B, that was discovered by Plaintiffs very recently during January of 2014, during this 2008 period that the RICO Defendants were heavily extorting and literally harassing, intimidating and attacking Plaintiff THEODOROPOULOS and his businesses on a daily basis for the purpose of inducing additional extortionate payments, for purposes of retaliation and of selective retaliatory prosecution, the RICO Defendants were holding illegally $20,546,499.00 of surplus monies in the EH S7K Fund that increased to approximately $23,371,286 at the end of FY 2008-09 and that was later misappropriated by the RICO Defendants and by Defendant COUNTY along with other EH related surplus funds that resulted in total calculated and estimated misappropriations of approximately $165.79 million by the RICO Defendants and by Defendant COUNTY.

30.   The presence of this very large balance of surplus funds in the EH S7K Fund is incriminating for the RICO Defendants because EH is a fee-offset regulatory agency and pursuant to existing legislation (*see* Paragraph 12, *supra*) is not allowed to charge Plaintiffs and other local businesses fees that are in excess of the actual cost of regulation.

31.   As a result, EH is not allowed by law to carry surplus balances anywhere close to the amount of $20,546,499.00 that was verified present in the EH S7K Trust Fund at the end of FY 2007-08 or to the amount of approximately $23,371,286 that was present in the EH S7K Trust Fund at the end of FY 2008-09, precisely because EH is a fee-offset regulatory agency that is specifically required by state law to limit

1  its regulatory fees to the actual cost of regulation and is under the obligation to

2  immediately lower these EH fees once any appreciable surpluses are discovered.

3      32.    This was not done in this case.  Instead, the RICO Defendants kept

4  seeking several consecutive fee increases and in addition to that they arbitrarily

5  imposed extremely high EH fees specifically upon Plaintiffs and upon hundreds of

6  other prepackaged food farmers' market vendors for the purpose of generation of

7  substantially increased revenues from these vendors which resulted in an increased

8  rate of generation of surpluses while at the same time the RICO Defendants engaged

9  in a scheme of distribution of these surplus money among themselves in the form of

10  excessive EH employee benefits and other types of excessive compensation and

11  while despite these on-going misappropriations they also carried very substantial

12  surplus balances in the EH S7K Fund for nine consecutive years from FY 2002-03

13  and all the way to FY 2010-11 according to budget figures presented in the April 12,

14  2011 letter by RICO Defendant FIELDING to the COUNTY BOS (*see* Exhibit A)

15  and according to the Auditor-Controller DPH Fiscal Review (*see* Exhibit B).

16      33.    It has been established therefore beyond any doubt at this point that the

17  RICO Defendants engaged in the extortion, harassment, intimidation and in a

18  relentless retaliation campaign against THEODOROULOS and his businesses while

19  they were involved in a scheme of misappropriation of these funds that were the

20  proceeds of specified unlawful activity including extortion and other crimes by

21  distributing them among themselves and among their co-conspirators in the form of

22  excessive compensation and through regular EH payroll and while at the same time

23  the RICO Defendants were illegally holding very large amounts of surplus money in

24  the EH Trust S7K Fund that was primarily the direct product of the extortion of

25  Plaintiffs and other farmers' market vendors similarly situated.

26      34.    On April 1, 2008, the RICO Defendants under pressure from multiple

27  written complaints by THEODOROPOULOS made a moderate reduction in the EH

28  fees for prepackaged food farmers' market vendors like Plaintiffs in an effort to

appease THEODOROPOULOS.  Due to the fact that this change in the EH fees was performed illegally however and due to the fact that these EH fees continued to be highly excessive even after this reduction, THEODOROPOULOS continued to complaint about these high EH fees and refused to purchase a $39.50 quarterly illegal, and according to state law "void", "Food Demonstrator" or "Sampling" permit that was arbitrarily imposed by the RICO Defendants upon Plaintiffs' business at the time on top and in addition to a basic $58.00 quarterly permit despite the fact that the basic permit was by far sufficient to cover the actual cost of inspection.

**35.**   As a result and in order to retaliate against THEODOROPOULOS for his repeated complaints about these extortionate EH fees, the RICO Defendants "Singled Out", "specifically targeted" and literally "Attacked" THEODOROPOULOS and his businesses for "Retaliation" and "Selective Prosecution" and in order to destroy his small business.  A small group of corrupt EH inspectors led by GRAJEDA started showing up that the Eliki Olive Oil, LLC stands at local farmers' markets and started literally harassing and intimidating the company's farmers' market stand operators by ambushing them, hiding and coming in from behind the stand and by using cameras to take pictures of anything and everything that was in the immediate area, by writing fraudulent inspection reports, hearing notices, etc., all designed to manufacture fraudulent criminal charges against THEODOROPOULOS for practices that are very common at farmers' markets and which the RICO Defendants were aware about during prior years and had accepted and allowed from 2002 and earlier that Plaintiffs were in this business and up to 2008 when these direct retaliatory attacks against THEODOROPOULOS and his businesses were initiated by the RICO Defendants.  In addition, only Plaintiffs were "targeted" and "prosecuted" for these alleged violations while the hundreds of other farmers' market vendors operating in Los Angeles County and that were sited from time to time for similar violations were never prosecuted while illegal vendors that

operated at the detriment to public health were actually protected by the RICO Defendants in exchange for the payment of these extortionate EH fees.

36.     As a result of this process of direct intimidation and daily harassment of Plaintiffs that lasted for most of 2008, the RICO Defendants filed one criminal case against THEODOROPOULOS with five (5) misdemeanor counts on December 24, 2008 (Case Number LAX8WA13672-01, hereinafter referred to as "LAX Case", *see* Exhibit C), and then as this was not enough, they filed another criminal case on April 3, 2009 with fifty (50) misdemeanor counts (Case Number LAA9CA00072-01, hereinafter referred to as "CCB Case", *see* Exhibit D) in an effort to seriously harm and/or destroy Plaintiffs' business.  Both of these cases are retaliatory in nature, both include multiple charges for "sampling" permits that were extortionate, illegally adopted and prohibited by law and both cases are devoid of factual and legal foundation.   In their efforts to harm and damage THEODOROPOULOS and his businesses, the RICO Defendants used the "shotgun methodology" by filing a large number of criminal charges against THEODOROULOS hopping in this manner to achieve their illicit objectives.   This is rather apparent from the plurality of the charges themselves and from the fact that the CCB 50-count case is still pending five years later primarily due to the inability of the prosecution to effectively prosecute the case as a result of the absence of factual and legal basis related for these criminal charges and the fact that the covert scheme of the RICO Defendants has been finally uncovered by Plaintiffs as a result of a prolonged and detailed investigation into their activities.

37.     The criminal charges filed therefore by the RICO Defendants against THEODOROPOULOS are fraudulent, sham retaliatory trumped-up charges whose sole purpose was to silence THEODOROPOULOS, to put financial and psychological pressure upon him and upon his family, and to damage his business so that the EH RICO enterprise could continue unabated its criminal racketeering activities of extortion.

38.     At least Twelve (12) of the fifty five (55) misdemeanor charges filed by the RICO Defendants against THEODOROPOULOS are "pure perjuries" because they are devoid of factual and legal foundation since the alleged "sampling permits" that THEODOROPOULOS indeed did not purchase were not only not required by law, but they were contrary to applicable legislation and thus expressly prohibited by law and void.   The remaining of the charges are fraudulent, sham, trumped-up retaliatory charges for things that normally occur at farmers' markets and are not considered crimes and never prosecuted or the product of falsification of inspection reports as is the case with an August 24, 2008 inspection that was performed by RICO Defendants ASKAR and SINGH at the Hollywood farmers' market where THEODOROPOULOS was present and where the inspection report was clearly falsified by RICO Defendants ASKAR and SINGH for the purpose of generation of fabricated criminal charges against THEODOROPOULOS.

39.     Furthermore, forty seven (47) of the fifty (50) misdemeanor counts filed against THEODOROPOULOS by the RICO Defendants in the CCB Case are either for alleged crimes that THEODOROPOULOS allegedly committed despite the fact that he was not even present at the time and place of the alleged violations and despite the fact that he could not possibly even been aware of the alleged violations much less have an intent to violate the law and in addition to that, eleven (11) of the fifty (50) misdemeanor counts are "pure perjuries" because they are for sampling permits that are not required by law and thus void, while the last three (3) counts for which THEODOROPOULOS was present are the direct result of the intentional falsification of the inspection report by RICO Defendants ASKAR and SINGH that have been heavily involved in the illegal racketeering activities and retaliation against Plaintiffs as the record will show.

40.     The LAX Case was dismissed on July 07, 2010 based on a brief informal diversion that the public defender at the time arranged for THEODOROPOULOS. The CCB Case is active to the present day due to the refusal of

THEODOROPOULOS to accept a settlement of the case at this time. This position was adopted by THEODOROPOULOS due to the need to hold the RICO Defendants accountable through civil litigation. This cannot happen if the fraudulent criminal cases filed by the RICO Defendants against THEODOROPOULOS are settled through various "Deals." On the other hand THEODOROPOULOS could not possibly afford from a financial standpoint to go through several criminal trials against a corrupt gang of EH inspectors and their supervisors.

41.    The position not to make a "Deal" on the 50-count CCB Case was also adopted by THEODOROPOULOS due to the very substantial financial damage that his company has suffered as a result of the corrupt acts on the part of the RICO Defendants and the fact that corrupt EH inspectors and RICO Defendants GRAJEDA and SINGH continued to extort, harass and intimidate Plaintiffs' business up until July 30, 2011 when they went to the Calabasas farmers' market stand operated by Eliki Olive Oil, LLC and issued a falsified inspection report and Hearing Notice (Hearing Notice No. 675051) for a "Food Demonstrator" or "Sampling" permit that was not required by law and thus void, that was prohibited by law and that was permanently abolished by Defendant COUNTY through the amendment to LACC Title 8 that was approved a few days earlier on July 26, 2011 by the COUNTY BOS.

42.    FIELDING in his April 12, 2011 letter to the COUNTY BOS claims the following (*see* Exhibit A):

"The last fee increase adopted by your Board was for FY 2007-08. At that time, your Board directed DPH to study the methodology for the public health fees. Subsequent to that action, and due to staff vacancies, revenues from the fees were not fully used and remained in the Environmental Health Trust Fund. DPH increased hiring to meet program needs, which resulted in a reduction in the Trust Fund balance. These actions, as well as normal salary growth (i.e., step increases and Board-approved salary and employee benefit increases subsequent to 2007) for the existing workforce and operating cost increases (e.g. fuel) will result in a projected depletion of the Trust

1   Fund balance by the close of FY 2010-11.  The existence of a balance in the Trust

2   Fund was the basis for not seeking a fee increase since FY 2007-08."

3       **43.**   FIELDING in his April 12, 2011 letter to the COUNTY BOS claims the

4   following (*see* Exhibit A):

5   "During FYs 2007-08, 2008-09 and 2009-10, EH's annual fee/revenue collections

6   remained constant at approximately $69 million.  EH expenditures were $66.7

7   million in FY 2007-08.   Because of the actions and issues noted above, EH

8   expenditures increased by $5.4 million in FY 2008-09, $5.6 million in FY 2009-10,

9   $1.8 million in FY 2010-11, and are projected to increase $2.1 million in FY 2011-

10   12."

11       **44.**   After the RICO Defendants were caught by the Auditor-Controller

12   therefore illegally holding $20,546,499.00 of surplus funds in the S7K Fund at the

13   end of FY 2007-08 (*see* paragraph 29, *supra*), which kept increasing and reached

14   approximately $23,371,286 at the end of FY 2008-09, the RICO Defendants in

15   cooperation with Defendant COUNTY devised a scheme to deplete these

16   incriminating surplus funds through misappropriation of these funds that included the

17   distribution of these funds among the RICO Defendants and their co-conspirators

18   (which is the motivation behind the creation of the EH RICO enterprise) and through

19   direct commingling and/or misappropriation by Defendant COUNTY and by RICO

20   Defendant FIELDING.  As a result of this scheme to misappropriate this surplus

21   money and other surplus funds that were constantly generated by EH as a result of

22   excessive and in the case of Plaintiffs extortionate EH fees, the RICO Defendants

23   claimed substantially increased EH expenditures by 8.1% during FY 2008-09 and by

24   7.8% during FY 2009-10 (these percentages were derived from analysis of the figures

25   presented by FIELDING in his April 12, 2011 board letter) in an effort by the RICO

26   Defendants to quickly "burn" or "deplete" as fast as possible this large sum of

27   incriminating surplus money by using increased hiring and increased fuel cost as an

28   explanation for these sharp increases in EH expenditures while the true cause of these

sharp increases in EH expenditures was the sharply increasing overtime pay, other pay, employees benefits and other forms of compensation of the RICO Defendants and of their co-conspirators in an effort to distribute among themselves all this money, as the available EH payroll records indicate; money that are the direct proceeds of specified unlawful activity including extortion and other crimes.

45.     This explanation presented by RICO Defendant FIELDING in order to justify these two sharp increases in EH expenditures during FYs 2008-09 and 2009-10 that were designed by the RICO Defendants to distribute among them the proceeds of extortion does not make much sense however because it does not check well with the actual numbers involved.   The Environmental Health staffing has remained pretty much constant between 2002 and 2013 at about 700 positions as graph P1 of Exhibit P shows.   Specifically, from 2002 to 2013 the Environmental Health division of the Los Angeles County DPH employed 707, 697, 685, 715, 670, 672, 692, 706, 718, 703 and 695 employees respectively.   The staffing variation therefore is not substantial enough to cause a surplus of $20,546,499.00 or $23,371,286.   These type of surpluses were generated because the RICO Defendants engaged in racketeering activities with the goal to generate surpluses of this type and as much money as possible for their segregated EH S7K Trust Fund so that this money could later be distributed among the RICO Defendants and their co-conspirators in the form of increased salaries, increased overtime pay, excessive employee benefits, etc.   Despite the great party in disproportionally increased overtime pay, other pay and substantially increased and almost exponentially increasing EH employee benefits that the RICO Defendants engaged in from 2003 and particularly from 2005 to the present as the Environmental Health payroll graphs of Exhibit P show in order to line their pockets with some of this "surplus" moneys that were generated through a pattern of racketeering activity, it was practically impossible for the RICO Defendants to absorb all the funds generated through extortion and at the end of FY 2007-08 they were finally caught by the Los Angeles

County Auditor-Controller illegally holding a surplus of $20,546,499, which is a very substantial amount of money for a fee-offset regulatory agency of this type.  This large surplus was generated because despite of all the disproportionate increases in compensation that the RICO Defendants received from 2003 and particularly from 2005 and to the end of FY 2007-08 because it was practically impossible for the RICO Defendants to distribute among themselves or to "burn" or "deplete" this kind of excess money in addition to the on-going excessive annual regular EH fee collections that were coming in as a direct result of their extensive racketeering activity at the expense of Plaintiffs and of other small businesses located throughout Los Angeles County.  It was also impossible to deplete these very large surpluses within the two year period and during FYs 2008-09 and 2009-10 just by hiring twenty (20) additional $50,000.00 per year Environmental Health inspectors during 2008 and another fourteen (14) additional employees during 2009 or as a result of a few pennies increase in the cost per gallon of fuel.  Furthermore, the price of fuel had substantially increased from 2007 and the difference between the 2007 and the 2008-2010 prices of fuel was not substantial enough to result in the depletion of the $20,546,499 that was present at the end of FY 2007-08 or the approximately $23,371.286 of "surplus" money that was present at the end of FY 2008-09 in the EH S7K Trust Fund.  Despite the fact that this "surplus" money and other excessive amounts collected by EH in the form of extortionate fees belonged to Plaintiffs and other rate payers, the RICO Defendants made every effort to distribute this money among themselves by artificially increasing base salaries, overtime pay, other pay and particularly employee benefits as the EH payroll records presented in Exhibit P clearly show and as part of the herein alleged criminal RICO scheme that has as its main motivation the personal financial gain of the RICO Defendants who are responsible for the misappropriation of approximately $165.79 million in EH related revenue from 2003 to the present, most of which have taken place during that last six fiscal years and as direct result of the herein alleged RICO scheme.

46.     Detailed analysis of the activities of the RICO Defendants related to these "surplus" funds that belong in part to Plaintiffs and in whole to various Los Angeles rate payers and particularly farmers' market vendors that were systematically extorted for years by the RICO Defendants, indicates that subsequent to the discovery of the $20,546,499 of "surplus" funds in the EH S7K Trust Fund by the Los Angeles County Auditor-Controller and immediately after the formation of even a greater surplus of approximately $23,371,286 by the end of FY 2008-09, the RICO Defendants in collusion with Defendant COUNTY increased the rate of misappropriation of funds to which they were engaged since 2003 and thus engaged in the gross misappropriation of these surplus funds and of other surplus funds collected subsequently by EH in the form of excessive fees by either distributing these funds among the RICO Defendants their co-conspirators and other EH employees during FYs 2008-09, 2009-10 and 2010-11 and up to the present in the form of highly excessive and artificially increased overtime pay, other pay and EH employee benefits that were above and beyond the base earnings of these EH employees and that resulted in EH employee benefits that amounted up to 40% of their base earnings in some cases or by illegally withdrawing large portions of these funds directly out of the EH S7K Trust Fund and by commingling these funds with other Defendant COUNTY funds and accounts for the purpose of eliminating the traceability of these funds and for the misappropriation of these funds to uses unrelated to EH inspections in violation of the law.  These "surplus" funds and other excess funds improperly collected by EH during subsequent years in the form of excessive EH fees however did not belong to the RICO Defendants, to EH employees or to Defendant COUNTY but to Plaintiffs and other rate payers that were responsible for the payment of these funds through the payment of excessive and extortionate EH fees that were illegally imposed upon them by the RICO Defendants for purposes of extortion as part of a pattern of racketeering activity and of the herein alleged elaborate RICO scheme.  These funds were required by the 1999 Court Order

to be held "in trust" on the behalf of Plaintiffs and these other businesses and the RICO Defendants, EH employees and Defendant COUNTY had no legal right or legal ownership of these "surplus" or excess funds that were derived from the imposition of excessive EH fees upon Plaintiffs and upon other businesses. The existence of these "surplus" or excessive funds therefore did not provide the RICO Defendants, the EH employees or Defendant COUNTY with a legal right to these funds or with ownership of these "surplus" or excessive funds, which means that the RICO Defendants, EH employees and Defendant COUNTY had no legal right to take the specific actions that they did take in order to "deplete" the $20,546,499.00 and $23,371,286 surpluses as well as prior and future surpluses through artificially increased EH employee compensation or through commingling and/or misappropriations by Defendant COUNTY that had absolutely nothing to do with EH inspections but that were specifically designed to "deplete" these surplus funds and to "conceal" the origin and true ownership of these funds that were the direct product of specified unlawful activity and other crimes and that clearly did not belong to the RICO Defendants or to Defendant COUNTY by distributing these surplus funds among the RICO Defendants, their co-conspirators, other EH employees and Defendant COUNTY.

47.     It must be noticed that during public hearings that took place between May and July 2011 for the amendment of LACC Title 8, the existence of this large surplus in the EH S7K Trust Fund was not openly disclosed by RICO Defendant FIELDING or by Defendant COUNTY BOS despite the fact that the January 26, 2009 Auditor-Controller DPH Fiscal Review (*see* Exhibit B), was sharply critical of DPH management about the existence of this very large surplus in the EH S7K Fund, by stating the following:

"Our review determined that DPH's health permit and license fees continue to generate excess funds. As of June 30, 2008 [end of 2007-08 fiscal year], the Environmental Health Trust Fund's balance totaled $20.5 million. An additional

review determined that the Department depleted its Trust Fund balance by Fiscal Year ending 2001-02, but in subsequent fiscal years (i.e., Fiscal Years ending 2002-03 through 2007-08) the Department began to experience significant increases in its Trust Fund balance.   Further, DPH sought and obtained Board of Supervisors' approval to increase its fees while having excess monies in its Trust Fund."  As the January 26, 2009 Auditor-Controller DPH Fiscal Review (*see* Exhibit B) shows, as the $10,890,608 of EH related funds that was deposited during 1999 into the newly created EH S7K Trust Fund by the County of Los Angeles was depleted during FY 2001-02, the RICO Defendants allowed the balance in their EH SK7 Trust Fund to got to negative $962,913 in order to create the impression of compliance with the 1999 Court Order that required them not to raise EH fees until the $10,890,608 surplus was depleted and then immediately thereafter sought and obtained during FY 2001-02 a 15.5% in EH fees in order to boost revenue into their newly created EH S7K Trust Fund and simultaneously increased the total EH payroll by 26.85% from $34,967,633.45 that was during 2002 to $44,355,741.06 during 2003 and then continued to seek six additional EH fee increases of the order of 5% despite the presence if overwhelming and increasing surpluses in the EH S7K Trust Fund, thus violating the 1999 Court Order that created this "segregated" fund and instructed them specifically not to increase EH fees in the presence of surpluses in the S7K Trust Fund.  The RICO Defendants from FY 2001-02 to the present in this manner misappropriated approximately $106,789,536 by artificially raising their overall compensation year-after-year by an effective rate of approximately 5.83%  which is much higher than the rate of compensation growth for other county employees that are paid directly by Defendant COUNTY by at approximately 3% and which resulted over the years in the distribution of approximately $106,789,536 among the RICO Defendants, their co-conspirators and other EH employees that amounts to a distribution of approximately $152,556.48 of extra money among each one of the 700 or so EH employees on the average.  Since the distribution of these funds among the

RICO Defendants and their co-conspirators was not even however, with management getting much more and lower level EH employees getting much less, this means that most of the RICO Defendants that are part of the management of the EH criminal RICO enterprise received approximately $300,000.00 each in excess funds as a result of this scheme while lower level EH employees received less than $100,000.00 each in excessive payments.   The origins of the herein alleged scheme therefore are in FY 2001-02 right after the creation of the "segregated" EH S7K Trust Fund and this RICO scheme evolved over the years in the apparent and continued effort of the RICO Defendants to improperly increase revenue over subsequent years for their newly created EH S7K Trust Fund at the direct expense of Plaintiffs and of other Los Angeles County based businesses with the personal financial gain of the RICO Defendants as a motive; a motive that was inadvertently created simultaneously with the creation of the "segregated" for "EH purposes only" EH S7K Trust Fund.

48.    FIELDING in his April 12, 2011 board letter indicated absolutely nothing about the existence of this $20.5 million "budget surplus" at the end of FY 2007-08 or of the approximately $23,371,286 "budget surplus" at the end of FY 2008-09.   The same is true for the COUNTY BOS that did not indicate during the May to July 2011 public hearings for the amendment of LACC Title 8 the prior existence of large "budget surpluses" that were in part commingled and/or misappropriated by Defendant COUNTY.   This information therefore was carefully and fraudulently withheld by FIELDING, BELLOMO and by the COUNTY BOS from Plaintiffs and from all other fee payers at the time of the 2011 public hearings despite the fact that all these individuals had full knowledge of the existence of these significant "budget surpluses" and of their implications in an apparent effort to further deceive and defraud Plaintiffs and other local businesses through the adoption of even higher EH fees by 19.42% and despite the obvious presence of these budget surpluses that were being grossly misappropriated at times prior to these public hearing and during FY's 2008-09 and 2009-10 and during the time of these public

1   hearings, during April to July 2011, by the RICO Defendants and by Defendant
2   COUNTY.

3       **49.**   In addition, the two consecutive sharp increases in the EH expenditures
4   of 8.1% and 7.8% for FYs 2008-09 and 2009-10 respectively that were announced by
5   FIELDING in his April 12, 2011 board letter were checked by Plaintiffs and found to
6   be real and to have actually been implemented by the RICO Defendants.  These two
7   large consecutive increases in the EH expenditures however were not primarily
8   caused by "increased hiring", "normal salary growth" and "increased fuel expenses"
9   as FIELDING claims in his April 12, 2011 board letter, but were primarily caused by
10  an attempt by the RICO Defendants to distribute among themselves and among their
11  co-conspirators and other EH employees in the form of substantially increased base
12  earnings, overtime pay, other pay and artificially increased employee benefits part of
13  the "surplus" or "excess" money that was generated in the form of excessive EH fees
14  and that did not belong to the RICO Defendants, EH employees or Defendant
15  COUNTY.  Although EH added a total of thirty four (34) new employees during
16  calendar years 2008 and 2009 combined, this is not the primary reason for the very
17  substantial increases in EH expenditures of 8.1% and 7.8% for FYs 2008-09 and
18  2009-10.  These two consecutive increases in EH expenditures of 8.1% and 7.8% for
19  FYs 2008-09 and 2009-10 respectively are extremely high and highly uncharacteristic
20  for an organization of the size and type of the Los Angeles County Environmental
21  Health Department because they indicate that EH grew in expenditures by 15.9%
22  during these two years while it increased in the size of its employment force from 672
23  employees during calendar year 2007 to 706 employees during calendar year 2009 or
24  by 34 new employees during the two years of 2008 and 2009 that amount only to a
25  5% increase in the number if EH employees.  In addition, the new employees that
26  were hired during 2008 and 2009 were entry-level health inspectors at the EHS I
27  and/or EHS II level that are compensated much lower than more senior EH
28  employees of the EH criminal RICO enterprise and definitely much lower than the

1   majority or all of the RICO Defendants.  The claims therefore by RICO Defendant
2   FIELDING that these two very substantial consecutive increases of 8.1% and 7.8% in
3   EH expenditures during FYs 2008-09 and 2009-10 were primarily caused by
4   "increased hiring", "normal salary growth" and "increased fuel expenses" as
5   FIELDING claims in his April 12, 2011 board letter makes absolutely no sense
6   because only about 2.5% of this 15.9% increase in EH expenditures was due to
7   increased hiring while the remaining 13.4% or so was due to an attempt of the RICO
8   Defendants to distribute among themselves part of these proceeds of extortion not in
9   the form of "normal salary growth" (since two annual consecutive increases in
10  compensation of approximately 6.7% each is not normal for County employees) as
11  RICO Defendant FIELDING claims, but in the form of highly and unreasonably
12  increasing overtime pay, other pay, EH employee benefits and overall EH employee
13  compensation (*see* Exhibit P) with the specific intent to deplete part of the
14  incriminating surpluses discovered during 2008 in the EH S7K Trust Fund by the Los
15  Angeles County Auditor-Controller through the improper distribution of these surplus
16  funds among the RICO Defendants and among their co-conspirators and other EH
17  employees and consistent with the criminal activities of the EH RICO enterprise
18  alleged herein.  What did occur therefore is that the base salary, overtime pay, other
19  pay and employee benefits of the RICO Defendants their co-conspirators and other
20  EH employees were substantially and artificially increased during this period (and for
21  the entire period from FY 2001-02 to the present) for the sole purpose and in an effort
22  to distribute among the RICO Defendants their co-conspirators and other EH
23  employees part of the large sums of money that were extorted from Plaintiffs and
24  other local businesses and to artificially inflate the future overall compensation of the
25  RICO Defendants, of their co-conspirators and of other EH employees; which was
26  the plan and financial motivation of the EH RICO Defendants all along for their
27  conspiracy to create the EH criminal RICO enterprise and for their direction of the
28  activities and direct participation in the affairs of the EH criminal RICO enterprise.

50.    The COUNTY BOS accepted this nonsense however and colluded with FIELDING and other RICO Defendants and co-conspirators to deceive THEODOROPOULOS that participated in all public hearings that were held between May and July 2011 for the amendment of LACC Title 8 and the entire Los Angeles County business community despite the fact that all five supervisors were fully aware of the existence of the $20.5 million "budget surplus" at the end of FY 2007-08 and of the way that this "budget surplus" was being misappropriated by the RICO Defendants and by Defendant COUNTY at the same time that these public hearings were taking place as it shall be shown throughout this Complaint. As a result, the RICO Defendants and Defendants COUNTY and COUNTY BOS perpetrated fraud upon Plaintiffs and upon the entire Los Angeles County business community and they deprived them of their intangible right to honest services.

51.    The question as to what really happened to the more than $20.5 million of "surplus funds" that were in the EH S7K Fund on June 30, 2008 or to the approximately $23,371,286 that was present in the EH S7K Trust Fund at the end of FY 2008-09 and that belonged to Plaintiffs and other fee payers and other excess funds that were collected in the form of excessive EH fees by the RICO Defendants was answered by a Civil Complaint filed on December 2, 2013 by the Los Angeles County Association of Environmental Health Specialists (hereinafter referred to as "LACoAEHS", Exhibit E) with the Los Angeles County Superior Court (Case No. BC529206, hereinafter referred to as "EH Inspector Complaint") against the COUNTY, the COUNTY BOS and FIELDING. The title "Environmental Health Specialist" is a fancy title for the "EH inspectors" or "health inspectors" and LACoAEHS is the union that represents these health inspectors.

52.    Based on the allegations of the EH Inspector Complaint and on a report issued by certified public accountant James Balbin of Macginnis Knechtel & McIntyre, LLP (see Exhibit E), the COUNTY, the COUNTY BOS and FIELDING commingled and/or misappropriated by the end of FY 2011 a total of $21,309,809 or

1   more than 100% of the entire $20,546,499 "budget surplus" that was illegally held by

2   FIELDING and discovered by the Los Angeles County Auditor-Controller in the EH

3   S7K Fund on June 30, 2008 and that by May 31, 2012, these same Defendants had

4   commingled and/or misappropriated a total of $27,877,009.45.   This money was

5   either withheld from deposit into the EH S7K Trust Fund or improperly withdrawn

6   directly from the EH S7K Trust Fund and subsequently commingled with other

7   Defendant COUNTY accounts and funds and part of this money was misappropriated

8   by Defendant COUNTY by using it for purposes that are completely unrelated to EH

9   inspections in violation of the 1999 Court Order that prohibits this type of activity by

10  Defendant COUNTY.   The exact manner in which these commingled and/or

11  misappropriated funds were channeled through the various COUNTY accounts and

12  subsequently used by Defendants COUNTY and FIELDING are unknown to

13  Plaintiffs at this point in time.   These monies that were directly withdrawn from the

14  EH S7K Trust Fund by Defendant COUNTY and other excess funds that were

15  distributed among the RICO Defendants and their co-conspirators in the form of

16  substantially and disproportionately increased employee base earnings, overtime pay,

17  other pay and excessive employee benefits belong in part to Plaintiffs and in its

18  totality to certain Los Angeles based businesses that were subjected to excessive and

19  extortionate EH fees and particularly to farmers' market vendors and do not belong to

20  Defendants COUNTY, COUNTY BOS, Defendant FIELDING or to the RICO

21  Defendants and their co-conspirators.

22      53.    This picture however that is painted by James Balbin of Macginnis

23  Knechtel & McIntyre, LLP is entirely different from the fraudulent picture presented

24  by FIELDING in his April 12, 2011 letter to the COUNTY BOS, to Plaintiffs and to

25  the Los Angeles County business community in support of the 2011 amendment to

26  LACC Title 8 where he falsely and fraudulently claims that "Historically, across-the-

27  board, annual fee adjustments based upon changes to EH's total operating costs were

28  recommended to and approved by your Board." and then presents budget figures for

1   EH expenditures and annual revenues whose analysis suggests that according to
2   FIELDING EH expenditures were raised by 8.1% and by 7.8% during FY's 2008-09
3   and 2009-10 respectively supposedly as a result of "increased hiring", "normal salary
4   growth and employee benefit increases subsequent to 2007" and "operating cost
5   increases (e.g., fuel)" and that these expenditures "[w]ill result in a projected
6   depletion of the Trust Fund balance by the close of FY 2010-11".

7       **54.**    There is no word whatsoever by RICO Defendant FIELDING in his
8   April 12, 2011 letter to the COUNTY BOS, to Plaintiffs and to the Los Angeles
9   County business community about the illegal depletion of $21,309,809 or more than
10  100% from the entire $20,546,499.00 June 30, 2008 "budget surplus" from the S7K
11  Fund in which Defendants COUNTY, COUNTY BOS and FIELDING had engaged
12  in since April 2010 and possibly earlier and up until April 12, 2011 that this
13  fraudulent letter was written by RICO Defendant FIELDING.  There is no word
14  whatsoever by FIELDING about the true reasons for the two very substantial
15  increases in EH expenditures of 8.1% and 7.8% during FY's 2008-09 and 2009-10
16  respectively which were no other but to distribute part of the proceeds of the
17  extortion activities of the EH RICO enterprise among the RICO Defendants, their co-
18  conspirators and other EH employees and in this manner to artificially raise the future
19  overall compensation of the RICO Defendants and their co-conspirators.  Instead,
20  FIELDING tried to "mask" these two very substantial consecutive increases in EH
21  expenditures as increases in the general expenditures of the Los Angeles County
22  Environmental Health Department, which was not true, particularly since it has been
23  shown that these two substantial and highly unusual consecutive increases in EH
24  expenditures occurred right after the Los Angeles County Auditor-Controller caught
25  the RICO Defendants improperly holding a $20,546,499.00 "surplus" in the EH S7K
26  Trust Fund at the end of FY 2007-08 and approximately $23,371,286 in surplus funds
27  at the end of FY 2008-09 and were motivated by the existence of these large
28  "surpluses" in the EH S7K Trust Fund and by the need to distribute some of these

1    "surplus" money and other excess funds that were collected by the RICO Defendants

2    in the form of excessive EH fees and through the extortion of Plaintiffs and other

3    small businesses among the RICO Defendants, among their co-conspirators and

4    among other EH employees.  During calendar years 2011, 2012 and 2013 the base

5    earnings of the RICO Defendants and other EH employees and co-conspirators were

6    actually reduced by Defendant COUNTY by an average of approximately 10.8%

7    from a total of $41,420,501.67 during calendar year 2010 to a total of $36,933,555.82

8    during calendar year 2013 (see graph P3 in Exhibit P) in an apparent effort by

9    Defendant COUNTY to control the artificial and almost exponentially increasing

10   compensation of the RICO Defendants that was driven primarily by the presence of

11   large amounts of surplus funds in the EH S7K Trust Fund that were the product of

12   extortion and racketeering activities.   The fact that the total EH payroll did not

13   substantially increase and remained almost flat between calendar years 2010 and

14   2011 at $57,999,503.62 and at $58,328,508.96 respectively (see graph P2 in Exhibit

15   P) combined by the fact that the base earnings of the RICO Defendants were

16   decreased by an average of 10.8% during calendar years 2011, 2012 and 2013 which

17   compromised the 15.9% increases in their compensation that the RICO Defendants

18   received during FYs 2008-09 and 2009-10 during the apparent effort by the RICO

19   Defendants and Defendant COUNTY to deplete incriminating surpluses from the EH

20   S7K Trust Fund by distributing these funds in part among the RICO Defendants and

21   their co-conspirators was seen by the RICO Defendants, their co-conspirators and

22   other EH employees as an effort by RICO Defendant FIELDING and by Defendants

23   COUNTY and COUNTY BOS to take away from them the very substantial increases

24   in compensation that they received during prior years as a result of the intentional

25   distribution among the RICO Defendants of "surplus" money that were the direct

26   product of extortion and other specified unlawful activity.  This 10.8% reduction in

27   base earnings that took place during 2011, 2012 and 2013 resulted in a reaction by

28   the RICO Defendants and their co-conspirators employed by EH who had their union,

1   the LACoAEHS investigate in detail the reasons for this 10.8% reduction in their

2   base earnings.  According to the James Balbin audit of the EH S7K Trust Fund, there

3   is a reduction of 12.17% in the overall compensation of the RICO Defendants, their

4   co-conspirators and of other EH employees dispersed directly from the EH S7K Trust

5   Fund during FY 2011-12.  This is correct as far as the James Balbin audit of the EH

6   S7K Trust is concerned, but our detailed analysis of the EH payroll data provided by

7   Defendant COUNTY and presented in Exhibit P indicates that the overall

8   compensation of the RICO Defendants, their co-conspirators and other EH employees

9   did not get reduced but was actually increased from $55,406,273.68 during 2010 to

10  $57,999,503.62 during 2011, to $58,328,508.96 during 2012 and to $61,804,709.40

11  during 2013 (*see* graph P2 in Exhibit P), which indicates the presence of a very

12  interesting divergence between decreasing base earnings during 2011, 2012 and 2013

13  and a simultaneous increasing overall compensation for the EH RICO Defendants

14  and their co-conspirators during the same time period (*see* graphs P2 and P3 in

15  Exhibit P).  Despite the continuously and sharply increasing overall compensation

16  that the RICO Defendants received all the way to 2013 and as a direct result of the

17  10.8% average reduction in their base earnings during calendar years 2011 to 2013,

18  the RICO Defendants and their co-conspirators had their union, the LACoAEHS file

19  a lawsuit against Defendants COUNTY, COUNTY BOS and RICO Defendant

20  FIELDING on December 2, 2013 by which they seek that Defendant COUNTY stops

21  commingling EH funds with other COUNTY accounts or funds.  The dichotomy

22  between the results of the James Balbin audit of the EH S7K Trust Fund that shows

23  an overall reduction in EH payroll directly dispersed from the EH S7K Trust Fund

24  during FY 2011-12 of 12.17% and the analysis of the actual EH payroll numbers

25  provided by Defendant COUNTY and presented in the graphs of Exhibit P that show

26  overall consecutive increases in EH payroll all the way to 2013 is the result of the

27  commingling of EH funds with other COUNTY accounts and funds by Defendant

28  COUNTY and of the fact that the RICO Defendants artificially increased overtime

1  pay, other pay and employee benefits during calendar years 2011, 2012 and 2013 in

2  order to "offset" or "make up" for the reduction that they experienced in base salary

3  and to actually continue to increase their overall compensation.  These actions by the

4  RICO Defendants as well as the lawsuit filed by their union, the LACoAEHS, on

5  their behalf, clearly indicate that the RICO Defendants and their co-conspirators

6  consider that they have a vested interest in the EH S7K Trust Fund and that as a far as

7  they are concerned they are entitled to all funds present in the segregated EH S7K

8  Trust Fund.  This wrongful sense of entitlement coupled by the belief that they could

9  not be held accountable by Plaintiffs or other small businesses that they extorted, led

10  the RICO Defendants to blatantly violate the law and to convert the public

11  Environmental Health into a criminal racketeering enterprise that engaged routinely

12  under their leadership and control and as matter of a regular way of doing business

13  into a pattern or extortion, protection and retaliation that constitutes racketeering

14  activities, public corruption and a complete betrayal of public trust.

15      55.    Then, FIELDING goes on in his fraudulent April 12, 2011 letter to the

16  COUNTY BOS, to Plaintiffs and to the Los Angeles County based business

17  community to state that "The existence of a balance in the Trust Fund was the basis

18  for not seeking a fee increase since FY 2007-08" but he fails to explain why he

19  sought and obtained six (6) consecutive fee increases from FY 2002-03 to FY 2007-

20  08 of the order of 5% while having significant surpluses in the S7K Trust Fund in

21  violation of the 1999 Court Order that created this "segregated" Trust Fund and in

22  direct violation of state law and fails to mention as well that along with Defendants

23  COUNTY and COUNTY BOS that exercise accounting control and management of

24  the S7K Trust Fund they had recently and illegally depleted $21,309,809 either

25  through withholding deposit of this money into the EH S7K Trust Fund or through

26  direct withdrawals from the S7K Trust Fund that were again in violation of the

27  standing 1999 Court Order and thus that the additional 19.42% overall increase in the

28  overall EH fees that he was requesting with his April 12, 2011 letter through the

1  proposed amendment of LACC Title 8 was not necessary since the current EH fee
2  schedule was already generating large surpluses and since the EH S7K Trust Fund
3  had large amounts of money in it but this money was being commingled and/or
4  misappropriated by the RICO Defendants, by RICO Defendant FIELDING and by
5  Defendants COUNTY and COUNTY BOS at the same time that RICO Defendant
6  FIELDING was writing and presenting his falsified and misleading April 12, 2011
7  board letter to the COUNTY BOS, to Plaintiffs and to the Los Angeles business
8  community with the specific intent to deceive and defraud Plaintiffs and the Los
9  Angeles business community and to deprive them of their intangible right to honest
10 services.

11      56.   RICO Defendant FIELDING therefore with his fraudulent and
12 misleading April 12, 2011 board letter and with his entire conduct over the past
13 several years deceived and defrauded Plaintiffs and the entire Los Angeles County
14 business community and knowingly and willfully presented falsified information
15 during the public hearings held between May and July 2011 in support of the
16 amendment of LACC Title 8 where he sought once again and received once again
17 from the complicit COUNTY BOS a very substantial additional and unnecessary
18 increase of 19.42% in the overall EH fees collected annually by the highly corrupt
19 Los Angeles County Environmental Health Department from Los Angeles County
20 based businesses.   This falsified and misleading April 12, 2011 board letter by
21 FIELDING was posted on the Environmental Health website along with other
22 falsified and/or misleading documents such as the falsified Fee Study and on the Los
23 Angeles County website with the intent to mislead, deceive and defraud.

24      57.   The overall fees collected annually by EH from Los Angeles County
25 based businesses were increased from $69 million to $82.4 million according to
26 FIELDING's April 12, 2011 letter which represents a hefty 19.42% jump in the EH
27 fees collected annually at a time based on the EH fee schedule that was in place prior
28 to the July 26, 2011 amendment of LACC Title 8.   The fee schedule that was in place

prior to July 26, 2011 has been shown to generate excessive EH fees and large surpluses that were extensively commingled and/or misappropriated by the EH RICO Defendants, by FIELDING, the COUNTY and the COUNTY BOS as shown above. All indications are however that the EH annual fee collection figures of $69 million and $82.4 million presented by FIELDING in his April 12, 2011 board letter are significantly lower than the actual EH annual fees collections that were at least $77 million and most likely approximately $80,450,872 before the July 26, 2011 amendment of LACC Title 8 and approximately $96,074,431 during FY 2011-12 and during subsequent fiscal years. FIELDING therefore intentionally understated EH revenues in an effort to deceive Plaintiffs and other members of the Los Angeles County business community and to fraudulently gain approval for an unnecessary overhaul of LACC Title 8 that resulted in even higher overall EH fees by 19.42% and that was based on a fraudulent and falsified and Fee Study and based on other fraudulent and falsified documentation. The record also shows that RICO Defendant FIELDING was, subsequently to this fraudulent 19.42% increase in overall EH fees and immediately after September 30, 2011 or shortly thereafter and immediately after the collection of the bulk of EH fees from local businesses for FY 2011-12 was completed, involved along with Defendants COUNTY and COUNTY BOS in the commingling and/or misappropriation of approximately a total of $51,503,274 or approximately $51.5 million either through the withholding of deposit of EH related revenue into the EH S7K Trust Fund or through direct withdrawals from the EH S7K Trust Fund that RICO Defendant FIELDING administers along with Defendants COUNTY and COUNTY BOS. The record also shows that RICO Defendant FIELDING on January 31, 2012 donated to the UCLA School of Public Health in the form of a "private gift" and in the form of stock that FILEDING held in the private mutual fund company Dimensional Fund Advisors (or DFA) that has been involved in the management of millions of dollars of UCLA endowment assets in the past and possibly during the present time. This allegedly "private gift" was made possible

according to publications as a result of a "stock windfall" that RICO Defendant FIELDING had or "miracle investment" that RICO Defendant FIELDING made. In other words, what is alleged by these publications regarding this $50 million gift is that RICO Defendant FIELDING bought stock in the tightly held private mutual fund company DFA allegedly with "private funds" and this stock increased substantially in value and probably multiple times over its original purchase price and to the point that it reached the amount of $50 million and was then donated by RICO Defendant FIELDING to the UCLA School of Public Health. Plaintiffs cannot help but notice however the fact that this allegedly "private gift" to the UCLA School of Public Health was given by RICO Defendant FIELDING out of his "unknown wealth" at the time according to publications and approximately four months after approximately $51.5 million of EH related revenue was commingled and/or misappropriated from the EH S7K Trust Fund and from receivables into that Trust Fund that RICO Defendant FIELDING administers along with Defendants COUNTY and COUNTY BOS.

58. As a result of FIELDING's presentation of falsified information and documentation and of the apparent complicity of the COUNTY BOS that was clearly aware both about the existence of the June 30, 2008 $20.5 million "budget surplus" and about the commingling and gross misappropriation of these funds, Los Angeles County based businesses and Plaintiffs' restaurant were hit practically overnight with very substantial increases in EH fees.

59. For example, the EH inspection fees for full-service restaurants that are the great majority of food facilities inspected by EH and that are present in very large numbers throughout Los Angeles County increased from 30.71% to 48.37% depending on the size of the restaurant, while other types of businesses entities received EH fees increases of the order of 100%, 200%, 300% and all the way up to 493% for one particular business category along with many newly instituted fees for a number of business categories that did not have to pay EH fees in the past.

60.     These monstrous EH fee increases that were and continue to be in violation of the state law were introduced by RICO Defendants FIELDING and BELLOMO based on the fraudulent April 12, 2011 board letter written by FIELDING and based on a fraudulent "Fee Study" that they touted as "Independent" but was neither "Independent", nor "Credible" or "Accurate" but simply another "Falsified" and "Fudged" document as was the board letter written by FIELDING. This falsified "Fee Study" was in part prepared by a private consultant named MGT of America, Inc. that Defendant COUNTY hired and paid in order to provide the necessary "cover" or "justification" for the proposed by the RICO Defendants extensive amendment or "overhaul" of LACC Title 8 that was designed by the RICO Defendants and Defendants COUNTY and COUNTY BOS to unnecessarily and illegally raise once again the total amount collected in the form of EH fees from local businesses by the EH criminal RICO enterprise. This falsified "Fee Study" was also in part prepared by EH staff who provided falsified and inflated "workloads" that were included in the "Fee Study" and that are partly responsible for the continual generation and continual imposition upon Plaintiffs and other businesses of extortionate EH fees to the present day.  The sole purpose of the July 26, 2011 overhaul of LACC Title 8 by the RICO Defendants was to provide a framework at the County level that would "legalize", "legitimize", "prolong" and "maintain" well into the future the continued extortion of Plaintiffs and of other Los Angeles County based businesses by the RICO Defendants with the excuse of EH inspections.  The RICO Defendants were assisted to attain this goal by complicit Defendants COUNTY and COUNTY BOS that continued later on during FYs 2011-12, 2012-13 and 2013-14 to commingle and/or misappropriate EH related funds with other COUNTY accounts and/or funds and to participate along with RICO Defendant FIELDING in the commingling and gross misappropriation of approximately an additional $38.12 million that were in addition to other substantial misappropriations by Defendants FIELDING, COUNTY and COUNTY BOS that had taken place before FY 2011-12

and that were of the order of approximately $21.31 million and in addition to very substantial misappropriations by the RICO Defendants themselves during calendar years 2003, 2004, 2005 and all the way to 2014 in the form of excessive and artificially increased EH employee base salaries, overtime pay, other pay and employee benefits that are of the order of approximately $106.79 million. The total misappropriations therefore as a result of this racketeering scheme by the EH criminal RICO enterprise are of the order of $165.79 million, approximately 2/3 of which or $106.79 million were distributed among the RICO Defendants in the form of excessive compensation and approximately another $59 million were commingled and misappropriated by Defendants COUNTY, COUNTY BOS and FIELDING to uses entirely unrelated to Environmental Health inspections in direct violation of applicable legislation and of a standing 1999 Court order.

61.    In his April 12, 2011 board letter FIELDING states the following:
"In April 2010, DPH utilized the Auditor Controller's Master Agreement process to contract with MGT of America, Inc. (MGT) to develop a methodology to determine the actual cost of services provided by EH. The resulting methodology allows DPH to determine fees consistent with actual costs. The cost for each service provided by EH is individually determined based on a calculation of the associated workload, e.g., *time required for a high-risk restaurant inspection,*" multiplied by "*annual frequency of inspection,*" multiplied by "*number of high-risk restaurants in the County*".

62.    The problem with all this is that MGT was not "Independent" but a consultant that was hired and paid for by Defendant COUNTY and by the DPH and given the task to come up with a way to increase the EH revenue from the $77 million per year that was before the 2011 LACC Title 8 amendment to approximately a whopping $96,074,431 or more per year that the RICO Defendants were aiming for in order to personally enrich themselves through the direct beneficiary relationship that exists between the RICO Defendants, their co-conspirators and other EH

1    employees and the EH S7K Trust Fund.  The most critical element of the "Fee Study"
2    that was presented by EH as an "Independent Study" by an "Independent Consultant"
3    is the "workloads" because these workloads enter directly into the formula that
4    determines the EH fees as FIELDING has clearly stated in his April 12, 2011 board
5    letter.  The problem with all this is that neither the Consultant, nor the Fee Study
6    were independent.

7         63.    These "workloads" were not determined by MGT.  They were not
8    checked by MGT for validity either.  They were determined by EH staff that have
9    clearly demonstrated and admitted and whose management has admitted that for the
10   past ten years or more they have been unable and/or unwilling to come up with
11   proper workloads and with EH fees that represent the actual cost of inspection and
12   that were responsible in part for the imposition upon Plaintiffs of extortionate EH
13   fees that were multiple times higher than actual cost of regulation.  These workloads
14   were not verified for accuracy by any independent third party and cannot therefore
15   under any circumstances be considered as "Independent".  Since the "workloads"
16   cannot be considered "Independent", the "Fee Study" cannot be considered as
17   "Independent" and it is not "Independent" simply because MGT that prepared the
18   "Fee Study" was not operating in an independent manner and because the
19   "workloads" that are a critical element of the "Fee Study" were prepared by EH staff
20   and by the RICO Defendants themselves that had admittedly been unable / unwilling
21   during the past decade to establish EH fees that are representative of the actual cost
22   of regulation and in line with requirements of state law and in fact had been involved
23   in an elaborate extortion scheme and in the intentional violation of numerous state
24   laws that required them to limit EH fees to the actual cost of regulation for the
25   purpose of improperly enriching themselves through the conversion of the public
26   Environmental Health into a criminal RICO enterprise.

27        64.    The RICO Defendants and other EH employees and co-conspirators
28   therefore were not qualified, were not independent, had already violated the law by

engaging in racketeering activities, had a vested financial interest in the outcome and had no business whatsoever being involved in the preparation of these "workloads".

65. Detailed checks of the workloads utilized in the "Fee Study" for prepackaged food farmers' market stands and for full-service restaurants against real inspection times and scenarios indicate that these "workloads" are significantly excessive and highly inflated and therefore continue to lead to excessive EH fees that are multiple times higher than the actual cost of inspection for Plaintiffs' prepackaged food farmers' market stands and for their full-service restaurant. These workloads are highly inflated simply because the RICO Defendants are simply unwilling to follow state law and they wish to continue the extortion of Plaintiffs and other Los Angeles County based businesses with their own financial gain as a motive. This conduct is extremely damaging for Plaintiffs and for the entire Los Angeles County economy and for economies beyond the narrow boundaries of Los Angeles County and must be terminated.

66. Primarily due to these "Fudged" and "Falsified" workloads, and for other reasons as well such as the incorporation of non-conforming with state law definitions for "temporary food booths" as opposed to the "temporary food facility or TFF" definition required by state law, the "Fee Study" presented by EH during the May to July 2011 public hearings and used in support of the July 26, 2011 amendment to LACC Title 8 is fraudulent because it includes definitions that continue to be in violation of state law and inflated workloads and as a result continues to generate to the present day EH fees that are multiple times higher than the actual cost of inspection for many business categories and perpetuates the extortion of Plaintiffs and other businesses while it represents a clear attempt by the RICO Defendants to "legitimize" and "legalize" and make permanent in this manner the continued extortion of Plaintiffs and of other Los Angeles County based businesses with the goal the unjust and illegal enrichment of the RICO Defendants at the direct expense of Plaintiffs and other local businesses.

67.   On February 16, 2012 RICO Defendant FIELDING announced that he was giving a gift that was independently valued at $50 million ($50,000,000.00) allegedly out of "private funds" that were in the form of stock in a private mutual fund company called Dimensional Fund Advisors to the UCLA School of Public Health where he was a part-time professor at the time.  RICO Defendant BELLOMO also has a teaching association with the UCLA School of Public Health.  As a result of this very substantial gift, the UCLA School of Public Health was renamed on March 22, 2012 as "Jonathan and Karin Fielding School of Public Health" based on the provisions of the gift agreement that RICO Defendant FIELDING signed on January 31, 2012 with UCLA.  In addition to numerous other requirements the gift agreement also required that "Faculty positions endowed from the Fund shall have Jonathan Fielding as part of their official title (e.g. Jonathan Fielding Professor of Public Health).  Student positions endowed from the Fund shall be named Fielding Scholars." (*see* Exhibit Q).

68.   According to published news articles,

"The money comes from Fielding's stock in a Texas-based private investment firm, Dimensional Fund Advisors, which manages assets worldwide. The school will receive the income from the stock and all profit from it if it is sold."

"The donation - and Fielding's unknown wealth – stunned colleagues, who thanked him for his generosity."

"This is a truly extraordinary gift," said Linda Rosenstock, the school's dean. "It shows that a leader who has devoted his life to public health believes in our future. He and his family have committed to this belief in an extraordinary way."

"I'm absolutely amazed," said Dr. Ron Chapman, director of the California Department of Public Health, who has known Fielding for 15 years. "With his donation, he's put an exclamation mark on his dedication to the future of public health."

"Dr. Robert Ross, president and chief executive of California Endowment, said of the gift: "Wow. Who knew?"

"This is a wonderful, surprising development," Ross said. "It sure does say something about his commitment to public service."

"Giving to UCLA, a great public university, to improve the public's health was the obvious choice and really the only choice," he said [FIELDING] from his Brentwood home Wednesday. "This is something we think can make a difference over many generations."

"Putting a stock windfall to philanthropic use, the head of Los Angeles County's public-health service has pledged $50-million toward medical studies at the University of California, Los Angeles, according to the *Los Angeles Times*.

The gift from Dr. Jonathan Fielding and his wife, Karin, is the largest by a factor of 10 to the UCLA's School of Public Health. The school, where Dr. Fielding has been a faculty member for 30 years, will be renamed for the couple.

The Fieldings' wealth, previously unknown to colleagues, comes from stock in Dimensional Fund Advisors, a Texas investment firm that manages assets worldwide. The UCLA public-health school will receive income from the stock and all profit if it is sold."

According to a February 16, 2012 article by The Chronicle of Philanthropy.

69. As a result of both the very good agreement in the timing and in the amounts involved between the $50 million worth donation made to the UCLA School of Public Health on January 31, 2012 that was publicly announced on February 16, 2012 by RICO Defendant FIELDING and his wife Karin Fielding supposedly out of a "stock windfall" or "miracle investment" and the approximately $51.5 million in EH related revenue that has been commingled by Defendants FIELDING, COUNTY and COUNTY BOS with the COUNTY'S general fund and/or other accounts by the end of September 30, 2011 or shortly thereafter and presumably subsequently misappropriated and as part of the approximately $59 million in total that seem based on all available evidence to have been commingled and/or misappropriated by Defendants FIELDING, COUNTY and COUNTY BOS between April 2010 or earlier and up to the present time to uses unrelated to EH inspections in violation of state law and of the standing 1999 Court Order, Plaintiffs will request from the honorable Court to order a forensic audit of all COUNTY accounts related to or associated with EH related revenue in order to account for all missing EH related revenue from April 1, 2010 forward and to the present time and to order a complete discovery of all financial documentation related to the $50 million gift to the UCLA School of Public Health by Jonathan and Karin Fielding and a forensic audit of all public or private accounts that may be related in any way to this $50 million gift to the UCLA School of Public Health by RICO Defendant FIELDING and his wife Karin Fielding. Plaintiffs believe the opening and the performance of a forensic audit in all these accounts that are associated with the missing EH related funds and with the $50 million gift to UCLA by RICO Defendant FIELDING and by his wife Karin Fielding is necessary because the amount of approximately $51.5 million that was commingled by Defendants FIELDING, COUNTY and COUNTY BOS up and until September 30, 2011 or shortly thereafter is very consistent both in terms of the actual amount involved and the timing involved related to the $50 million gift given to

UCLA by RICO Defendant FIELDING and his wife Karin Fielding in the form of a "private gift" out of "private funds" only four months subsequent to the commingling of approximately $51.5 million of EH related revenue by RICO Defendant FIELDING himself who was responsible at least in part for the administration of the EH S7K Trust Fund and who was sued on December 2, 2013 by the LACoAEHS for the mismanagement of the EH S7K Trust Fund and for "Breach of Fiduciary Duty". Furthermore, this large amount of money that was commingled by Defendants FIELDING, COUNTY and COUNTY BOS with other Defendant COUNTY accounts and/or funds continues to be unaccounted for as far as Plaintiffs are aware at present. Plaintiffs are not aware at present how this large amount of approximately $51.5 million was been commingled and/or misappropriated by Defendants FIELDING, COUNTY and COUNTY BOS was channeled through the various Defendant COUNTY accounts and/or funds or how it may have ended up being used and/or misappropriated by Defendants FIELDING, COUNTY and COUNTY BOS because this type of detailed information is beyond the reach of Plaintiffs at this time and under the control of Defendants FIELDING, COUNTY and COUNTY BOS. Plaintiffs have requested through a public information disclosure request from UCLA to provide all available documentation concerning this $50 million gift to the university by FIELDING, but despite the fact that this request was placed on January 17, 2014, Plaintiffs have received only limited information disclosures from UCLA. A disclosure of the gift agreement was finally made on July 16, 2014 but significant portions of this gift agreement were blocked out by UCLA that claimed that this material was exempt from disclosure based on California Government Code sections 6254(c) and 6255. A detailed examination of available EH financial records indicates that by September 30, 2011 approximately $21.63 million in EH related revenue were directly withdrawn from the EH S7K Trust Fund or withheld from receivables that were never deposited into the EH S7K Trust Fund by Defendants FIELDING, COUNTY and COUNTY BOS that administer the EH S7K Trust Fund and

commingled with Defendant COUNTY accounts and/or funds while an additional approximately $29.87 million were completely hidden from the EH 2011-12 revenue collected during September 2011 or shortly thereafter, were withheld from deposit into the EH S7K Trust Fund at the time as the James Balbin accounting report indicates and were never deposited into the EH S7K Trust Fund as the 1999 Court order requires which means that by the end of September 30, 2011 or shortly thereafter approximately $51.5 million of EH related revenue was commingled with other COUNTY accounts and/or funds and very likely misappropriated by RICO Defendant FIELDING and Defendants COUNTY and COUNTY BOS to uses unrelated to Environmental Health inspections in violation of the law.  As a result of the agreement of both of the amount commingled and of the timing that these EH related funds were commingled that precedes the donation of the $50 million gift to UCLA by RICO Defendant FIELDING and his wife Karin Fielding by only four months, Plaintiffs believe that extensive discovery is in order both related to the commingled and/or misappropriated $51.5 million up to September 30, 2011 or shortly thereafter or up to $59 million up to the present time in EH related money and to the $50 million gift given to the UCLA School of Public Health by RICO Defendant FIELDING and by his wife Karin Fielding in order to determine exactly how this commingled EH money was channeled through various COUNTY accounts and/or funds and exactly when exactly RICO Defendant FIELDING and his wife Karin Fielding purchased this stock in the DFA private mutual fund company and particularly in order to determine if this DFA stock was purchased between September 2011 and January 2012 all at once or at any other times all at once and/or in increments and to substantiate the allegations by RICO Defendant FIELDING and by his wife Karin Fielding that this DFA stock was purchased with "private funds" and that appreciated multiple times over from the day of its purchase to January 31, 2012 that it was donated to the UCLA School of Public Health in the form of a "private gift" in a manner that it created a "stock windfall" as indicated in

publications related to this $50 million gift.  It will be of interest to Plaintiffs and for the proper administration of justice to determine exactly from whom RICO Defendant FIELDING purchased this DFA stock that is closely held and that is not available for sale in the open market and that it does not have a published price per share and at what price and if a Financial Advisor was involved in this transaction or not and if any other investors in DFA stock around the United States or around the world realized similar gains or a similar "stock windfall" compared to that of RICO Defendant FIELDING.   Plaintiffs believe that all EH related funds that were commingled and/or misappropriated by Defendants FIELDING, COUNTY and COUNTY BOS were commingled and/or misappropriated with the direct knowledge and agreement of Defendant COUNTY BOS.  If this proves to be the case, there is a serious problem of course because this money does not belong to RICO Defendant FIELDING, does not belong to Defendants COUNTY and COUNTY BOS and is not public money either and this money was obtained through extortion of Plaintiffs and misappropriated through practices that involve extensive money laundering.   This money belongs to Plaintiffs and other local businesses and based on the 1999 Court Order is required to be held "in trust" until used for the health inspection of their businesses.   Under no circumstances can EH related money be commingled with COUNTY accounts and/or funds as clearly has occurred in this case and subsequently "misappropriated", "privatized" and/or "donated" or handled in a manner that in specifically intended to conceal the very existence of these surplus EH related funds and/or the origin and true ownership of these EH related funds as may very well have occurred in this particular case because these acts constitute very serious money laundering violations.   The fact that large amounts of money have been commingled with COUNTY accounts and/or funds has been established at this point beyond any doubt.   What has not been established is what has exactly happened to these funds and how these funds were channeled through the various Defendant COUNTY accounts and/or funds due to the lack of access that Plaintiffs have to this type of

information that is beyond the reach of Plaintiffs at this point and under the direct control of Defendant COUNTY. One thing is certain however is that RICO Defendant FIELDING and Defendants COUNTY and COUNTY BOS simply cannot mishandle, commingle and/or misappropriate other people's money in this manner, but all indications based on all currently available financial information are that this is indeed what has happened in this case. The fact that funds of approximately the same amount are missing from the EH S7K Trust Fund that was under the administration of RICO Defendant FIELDING and of Defendants COUNTY and COUNTY BOS just four months preceding this $50 million gift to UCLA by RICO Defendant FIELDING and by his wife Karin Fielding and the fact that these EH related funds continue to be unaccounted for is rather troubling to Plaintiffs who request the honorable Court shed ample light on these questionable financial transactions by ordering a forensic audit of all related COUNTY and private accounts as needed and as warranted based on evidence generated through the process of discovery. Based on all currently available information to Plaintiffs, the conduct of the RICO Defendants and possibly of the Defendant COUNTY BOS and of other upper level COUNTY officials indicates an overwhelming level of public corruption and lack of respect for the rule of law within Defendant COUNTY and by RICO Defendant FIELDING who is the leader of the EH criminal RICO enterprise, by the remaining RICO Defendants and by Defendant COUNTY BOS as well without whose knowledge and approval these types of highly questionable financial transactions including the already fully established commingling of millions of dollars of EH related revenue would not have been possible.

70. As a result of EH fees that continued to be excessive and multiple times higher than the actual cost of inspection, on March 6, 2012 THEODOROPOULOS, who was not aware at the time that a few days earlier, on February 16, 2012, RICO Defendant FIELDING had announced a $50 million gift to UCLA School of Public Health allegedly out of "private funds", went again before the COUNTY BOS and

during the public comment period of the open session informed the COUNTY BOS once again that the Environmental Health Department fees imposed upon his business continued to be multiple times higher than the actual cost of inspection and that his business continued to be extorted and that this conduct violates state and federal laws and that he had complained as a result to the FBI for continued violations of the Hobbs Act by employees of Environmental Health.

71. On March 27, 2012 and in direct retaliation for the public complaints for extortion of his business in front of Defendant COUNTY BOS and for complains filed by THEODOROPOULOS with the FBI for violations of the Hobbs Act by the RICO Defendants, the COUNTY BOS and RICO Defendants FIELDING and BELLOMO conspired with other RICO Defendants and engaged once again in their familiar practice of improperly using their regulatory authority for the filing fraudulent retaliatory criminal charges against THEODOROPOULOS. As a result, the RICO Defendants in an effort to conceal their own felonious criminal conduct and in an effort to intimidate THEODOROPOULOS promptly initiated once again additional criminal proceedings against THEODOROPOULOS according to available records. The excuse this time was the July 30, 2011 incident that took place eight (8) months earlier than this March 27, 2012 date and during which corrupt EH inspectors GRAJEDA and SINGH tried once again to extort Plaintiffs and issued a falsified inspection report and Hearing Notice No. 675051 for a "Food Demonstrator" or "Sampling" permit that void and that was not only not required by law and expressly prohibited by law, but that was also completely abolished a few days earlier on July 26, 2011 by the COUNTY BOS when the amendment to LACC Title 8 was adopted.

72. The fact that this third criminal case against THEODOROPOULOS was filed eight (8) months after this July 30, 2011 incident at the Calabasas farmers' market is indicative of the retaliatory nature of the case. The case included two (2) misdemeanor counts (Case Number ZMB00706, hereinafter referred to as "Malibu Case", Exhibit F), both of which are fraudulent, sham and trumped-up charges as are

the remaining fifty five (55) counts that were filed in 2008 and in 2009 and fifty (50) of which are still pending to this day because the RICO Defendants are finding it difficult to prosecute THEODOROPOULOS due to the lack of factual and legal foundation for these fraudulent charges and due to the overwhelming underlying public corruption and associated racketeering activities in which the RICO Defendants that filed these fraudulent retaliatory criminal charges have engaged in.

73.    This brings the total number of criminal retaliatory counts filed by the RICO Defendants against THEODOROPOULOS to fifty seven (57) in three separate criminal cases and it serves as solid proof of the extent to which the Los Angeles County EH criminal RICO enterprise will go to protect its illegitimate interests and to maintain its extortion scheme going and of the tenacity of this criminal organization and of the RICO Defendants.

74.    One of these two Malibu Case counts fraudulently alleged interference with an inspection despite the fact that at the time corrupt inspectors GRAJEDA and SINGH were inspecting a competitor of Plaintiffs and therefore THEODOROPOULOS could not possibly have a motive, desire or ability to interference with their inspection.  The charge was constructed in such a manner by purposely including falsified aggravated circumstances that alleged sexual harassment and other unsupported and fabricated sexually related allegations involving a child that Plaintiff THEODOROPOULOS never met or saw, in order to threaten THEODOROPOULOS with substantial jail time if convicted.  These falsified a fabricated charges against Plaintiff THEODOROPOULOS were put together by the Los Angeles County DA's Office this time despite the fact that the DA's public integrity division had been fully informed long ago through several written complaints filed with them by THEODOROPOULOS who pleaded with them to place an experienced investigator on the case because his business and himself were subjected to extortion and profound abuse by the RICO Defendants.  Deputy District Attorney David Demerjian and District Attorney Steve Cooley replied to

Plaintiff THEODOROPOULOS at the time that "they could not enforce state laws against county employees because they work for the COUNTY" and refused to investigate. When the RICO Defendants went to them however with falsified and fabricated retaliatory criminal charges for an incident that had occurred eight (8) months earlier, the DA was quick to file criminal charges against Plaintiff THEODOROPOULOS and to add falsified aggravated circumstances on top of that in order to threaten THEODOROPOULOS with jail time. The RICO Defendants therefore did what they did and engaged in this profound extortion and retaliation scheme because they knew that they had the support of both the Los Angeles City Attorney and of the District Attorney. They alleged sexual harassment in the charges that they filed. Who wants to sexually harass three ugly old man however, especially when one of them carries a gun? The other count was a totally fraudulent count (i.e. an outright perjury) for a "Food Demonstrator" or "Sampling" permit that was void, was not required at any time by law, that was indeed prohibited by law and that had been completely abolished at the time even by the corrupt EH Department. This proves once again how far the RICO Defendants will go in order to maintain the lucrative for them extortion activities of the EH criminal racketeering enterprise.

75.   THEODOROPOULOS learned of the $50 million gift to the UCLA School of Public Health by FIELDING allegedly out of "private funds" in December of 2013 through published reports. THEODOROPOULOS learned of the LACoAEHS Complaint in January of 2014 and received a copy of that Complaint in February of 2014. This enabled Plaintiff THEODOROPOULOS to make the connection between the $20.5 million "budget surplus" monies of June 30, 2008 that were discovered by the Los Angeles County Auditor-Controller in the EH S7K Trust Fund to the commingling and/or misappropriation of $21,309,809 or more than 100% of these "surplus" funds by the end of FY 2010-11 and to the commingling and/or misappropriation of a total of $27,877,009.45 through direct withdrawals from the S7K Fund or from EH related revenue receivables withheld from deposit into the EH

1  S7K Trust Fund by May 31, 2012 according to certified public accountant James
2  Balbin and of an additional approximately $29.87 million that was obtained directly
3  from FY 2011-12 EH revenue that was collected during September 30, 2011 or
4  shortly thereafter and was actually completely hidden and not reported as EH related
5  revenue and never deposited into the EH S7K Trust Fund as alleged in the
6  LACoAEHS Complaint (*see* Exhibit E) and to the very possible connection of this
7  repeated and continual commingling and/or misappropriations of millions of dollars
8  to "Fielding's Unknown Wealth" according to published articles regarding the
9  February 16, 2012 announcement of the $50 million gift to the UCLA School of
10 Public Health.

11      **76.**    RICO Defendants FIELDING and BELLOMO who were present in the
12 Los Angeles County auditorium during the March 6, 2012 public meeting of the
13 COUNTY BOS were absolutely stunned to see THEODOROPOULOS openly and
14 during a public and televised BOS meeting accuse them of "extortion" a few days
15 after FIELDING had made a commitment on January 31, 2012 and a public
16 announcement on February 16, 2012 to donate Fifty Million Dollars ($50,000,000.00)
17 allegedly out of his [unknown at the time] personal wealth to the UCLA School of
18 Public Health.  They felt at that point that THEODOROPOULOS should have gone
19 away by that time after the July 26, 2011 amendment to LACC Title 8 and simply
20 could not "afford" to have someone screaming "extortion" in public against RICO
21 Defendant FIELDING when FIELDING had just committed to donate Fifty Million
22 Dollars ($50,000,000.00) allegedly out of his [unknown at the time] "personal
23 wealth", so that he could go down as a philanthropist and have the name of the
24 UCLA School of Public Health changed in his and in his wife's honor for ever in
25 order to immortalize his name.

26      **77.**    The RICO Defendants therefore reverted once again to their old familiar
27 techniques of retaliation and intimidation through fraudulent, sham and trumped-up
28 criminal charges in an effort to protect themselves from disclosure of the

misappropriation of millions of dollars from the EH S7K Fund, to conceal their criminal felonious racketeering activities and in another desperate attempt by them to contain and silence THEODOROPOULOS through the pilling up of fraudulent and fabricated retaliatory criminal charges.

78.     What the RICO Defendants have not realized however was that their continual retaliation and harassment of THEODOROPOULOS did not have the intended effect but the entirely opposite effect because in an effort to protect his interests, his reputation, his company and his family THEODOROPOULOS engaged in a detailed investigation of the activities of the Defendants which eventually resulted in this highly detailed racketeering Complaint that is supported and substantiated by extensive EH related financial data.

79.     Despite the fact that RICO Defendants FIELDING and BELLOMO were present during the March 6, 2012 COUNTY BOS hearing and they had ample opportunity to speak and to refute the complaints made by THEODOROPOULOS about "extortion" of his business by the EH RICO enterprise, they chose to remain silent, not to speak and not to respond directly or indirectly to THEODOROPOULOS' public charges that they continued to "extort" his business. Instead, they let Supervisor Zev Yaroslavsky that was presiding at the time over the COUNTY BOS to do their dirty work for them.  In an effort to contain the damage and stop THEODOROPOULOS from speaking during this televised hearing, Yaroslavsky directed the County CEO, William T. Fujioka to investigate the complaints by THEODOROPOULOS and to respond to the COUNTY BOS.

80.     On April 16, 2012, the COUNTY CEO FUJIOKA issued a letter in an attempt to address the issue through a clear effort to confuse the issue, (see Exhibit G).  The letter is practically littered with false and misleading statements, lies and false and inappropriate comparisons.  This was a continued attempt by Mr. Fujioka and by Defendant COUNTY to confuse the issue and to fraudulently conceal the

1  racketeering activities of the RICO Defendants in an effort to continue to avoid to
2  properly address these issues.

3      81.    Plaintiffs feel that with this letter COUNTY Chief Executive Officer
4  ("CEO") William T. Fujioka overstepped his bounds and actively acted to protect and
5  maintain the extortionate racketeering scheme that the RICO Defendants have
6  engaged in the past and that the RICO Defendants have tried to "fine-tune",
7  "legitimize" and "legalize" so that it could stand up to scrutiny and be perpetuated in
8  time with the passage of the July 26, 2011 sweeping amendment or "overhaul" of
9  LACC Title 8 that was procured by the RICO Defendants and gladly approved and
10 adopted by the complicit Defendant COUNTY BOS based on the presentation of
11 fraudulent supporting documentation by the RICO Defendants and based on
12 misrepresentations made at the time towards Plaintiffs and towards to entire Los
13 Angeles business community by the RICO Defendants and by the COUNTY BOS
14 that were at the same time involved in the commingling and/or misappropriation of
15 millions of dollars directly from the EH S7K Trust Fund in violation of the standing
16 1999 Court order and of state law.  As a result, Plaintiffs believe that Mr. Fujioka
17 with his April 16, 2012 letter attempted to cover up and fraudulently conceal the
18 criminal racketeering activities of the RICO Defendants and to help perpetuate these
19 criminal racketeering activities and the deception of Plaintiffs and of the entire Los
20 Angeles business community well into the future and thus actively participated and
21 conspired to participate in the extortion scheme and fraud that is currently
22 perpetuated against Plaintiffs by the RICO Defendants.  From his capacity a
23 COUNTY CEO, William T. Fujioka acted to conceal, further, actively support and
24 prolong the extortionist activities of the EH criminal racketeering enterprise and as a
25 result William T. Fujioka could be charged with racketeering violations as a result
26 pending additional discovery.

27      82.    The RICO Defendants are characterized by an ability to bind together
28 and to conspire as a "gang" in order to do the wrong thing every time that the

racketeering activities and their EH criminal RICO enterprise are threatened or even questioned. This is what they did in the prior criminal cases that they filed against THEODOROPOULOS and this is what they did in the more recent Malibu Case as well. They "gang up together" to prepare fraudulent inspection reports, fraudulent affidavits, they regularly and intentionally omit material facts and do their best, all RICO Defendants acting as one, and by taking full advantage of their official capacity and of the regulatory authority entrusted upon them by the State of California to bring again and again and for the third time in this Malibu Case fraudulent criminal charges against THEODOROPOULOS. They are a "criminal gang" or "criminal enterprise" therefore and they act as one and bind together and do the wrong thing while they are all aware that what these acts that they are involved in are wrongful and unlawful and their mentality or mode-of-operation is not necessarily much different from that of a common criminal street gang. Although the illegal acts of the EH criminal gang do not result in gunshot wounds for their victims, at least not to this day, they do result in profound physical, psychological, financial and other forms of violence that are both criminal and highly damaging for their victims as has been fully experienced by Plaintiffs.

83. The two criminal counts filed in the Malibu Case were withdrawn based on a coerced "Deal" that was made by criminal defense attorneys Geragos & Geragos hired by THEODOROPOULOS who refused to confront the COUNTY, who refused to inform the Court of the "extortion" and overwhelming public corruption that underlined the case despite repeated requests from THEODOROPOULOS to do so, who refused to do any discovery whatsoever in a case that is riddled and clearly tainted by public corruption, who refused to tell the truth to the Court as was clearly and repeatedly presented to them by THEODOROPOULOS, who despite not doing their work properly as defense attorneys tried to extract an additional $30,000.00 from THEODOROPOULOS on top of the $20,000.00 that were already paid to do defend THEODOROPOULOS and who refused to confront Superior Court Judge

Lawrence Mira that operated under a financial conflict of interest since he had received approximately $600,000.00 directly from Los Angeles County that was a party to the case in the form of local judicial benefits and which he failed to disclose during these criminal proceedings.   THEODOROPOULOS, was aware of all these issues and was very concerned about his ability to receive a fair trial given the extent of the conflict of interest involved from all sides participating in this case, including from the side of his criminal defense attorneys.

84.   As a result of the illegal extortion activities of the EH criminal RICO enterprise over approximately a decade, Plaintiffs have been illegally induced and forced to pay in order to stay in business from 2002 to the present at least $86,454.00 in the form of EH fees to the RICO Defendants (*see* Exhibit H), with the great majority of this large amount of money paid in the form of highly extortionate farmers' market health inspection fees for the prepackaged food farmers' market stands operated by Plaintiffs that were at times up to twenty two (23) to forty four (46) times higher than the actual cost of inspection, in most cases were duplicate as well (i.e. had already been paid by farmers' market sponsors) and in some cases up to fifty (50) times higher than fees imposed by other California Counties for similar inspection services (*see* Exhibit I).

85.   From 2002 to June 30, 2011 these extortionate induced payments were imposed on Plaintiffs and paid by Plaintiffs in regular intervals of every three months, i.e. on a quarterly basis.  From July 1, 2011 to the present and pursuant to the July 26 amendment of LACC Title 8 that was retroactive to July 1, 2011, these extortionate induced payments were imposed upon Plaintiffs every year, i.e. on an annual basis.   In all cases from 2002 to the present, these induced extortionate payments were and continue to be multiple times higher than the actual cost of inspection and during the time period from 2002 to June 30, 2011 they were duplicate as well because the cost of inspection was already covered by fees paid by farmers'

market sponsors who were then in turn paid by Plaintiffs and other vendors (*see* Exhibit I).

86.    It is estimated by Plaintiffs that out of the $86,454.00 or more in total induced payments made by Plaintiffs to EH and essentially to the RICO Defendants from 2002 to the present and that have been currently verified based on available receipts, cancelled permits and tax records, approximately $78,354.50 or more were multiple times in excess of the actual cost of inspection and/or duplicate and thus extortionate payments (*see* Exhibit J).   The remaining $8,099.50 is determined to represent legitimate cost of regulation.  As additional documentation is reviewed, the total induced extortionate payments to EH by Plaintiffs in the form of extortionate EH fees may increase.

87.    In addition to the $78,354.50 in induced extortionate payments, Plaintiffs have suffered substantial proximate damage to their businesses as a result of the lack of seed capital required to engage in interstate and foreign commerce since the primary business of Eliki Olive Oil, LLC is the importation and distribution of food products from Greece to the United States market through channels of interstate and foreign commerce.

88.    Plaintiffs have also suffered substantial proximate damage to their business as a result of the prolonged criminal racketeering activity by the RICO Defendants, the daily intimidation and harassment to which their business operations were subjected by the RICO Defendants that improperly utilized and exercised their regulatory authority over Plaintiffs' business in an effort to enforce the extortion scheme of the EH criminal RICO enterprise upon Plaintiffs, as a result of the protection of illegal vendors that were in direct competition with Plaintiffs by the RICO Defendants in exchange for the payment of extortionate fees, as a result of the RICO Defendants' interference with Plaintiffs' marketing strategies, as a result of the fifty seven (57) fraudulent and retaliatory criminal counts that were filed by the RICO Defendants in three separate criminal cases against THEODOROPOULOS in support

of the extortion activities of the EH criminal racketeering enterprise, and a result of the RICO Defendants' interference with the professional activities of Dr. THEODOROPOULOS in the fields of engineering and foreign commerce.

89.     The Courts have found that even the filing of fraudulent charges in conjunction with a racketeering scheme and in an effort to coerce and extort money from a victim can result in direct and proximate damages to the victim and warrant injunctive relief independent of whether or not the RICO Defendants succeeded in their efforts to actually extort money from their victim and that these corrupt acts and attempts to extort money from the victim are by themselves violations of the RICO Act and provide the victim both with the proximate cause and standing required to sue under the RICO Act and with the right to seek private injunctive relief from further damages based on the RICO statute, *Chevron Corp v. Steven Donziger et al, U.S. District Court for the Southern District of New York, No. 11-0691*.  In this case the RICO Defendants have actually extorted large sums of money in regular three-month intervals and have willfully engaged in a clear pattern of continuous and related racketeering activity that is part of a single cohesive scheme and that spans more than ten years and that includes multiple continuous and related predicate acts that were committed as part of the regular way of doing daily business of the EH criminal RICO enterprise and that included the direct "targeting" of Plaintiffs for extortion, coercion and retaliation with the specific intent to harm Plaintiffs in their business and therefore Plaintiffs are entitled both to the recovery of damages and to injunctive relief from further damages as provided by statute and case law.

90.     The RICO Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et Seq*., with predicate acts of extortion, money laundering, obstruction of justice, retaliation, engaging in monetary transactions in property derived from specified unlawful activity, among others.  In addition, Defendants' conduct constitutes violation of 42 U.S.C. § 1983, common law perjury, honest services fraud, fraud, trespass to chattels, unjust enrichment, civil

conspiracy, violation of California Government Code § 66014, § 66018 and § 6062(a), violation of the California Health and Safety Code § 101325 and § 114381(d), violation of California Attorney General Opinion 92-506, violation of Los Angeles County Code, Title 8, §8.04.710, *et Seq.*, violation of California Code of Civil Procedure § 526(a), and violation of California Constitution article XIII A, and its amendment through California Prop 26, among others.  As a result, Defendants' misconduct entitles Plaintiffs among other things, to statutory and compensatory damages arising out of Defendants' violations of Plaintiffs' rights under federal and state law, to injunctive relief precluding Defendants from the further extortion of Plaintiffs through the continued imposition of EH inspection fees that are multiple times the actual cost of inspection and from further retaliation against Plaintiffs and related equitable relief.

## PARTIES AND RELEVANT NON-PARTIES

**Plaintiffs**

91.   THEODOROPOULOS owns and operates a food company called Eliki olive Oil, LLC and has done business under the DBA "Eliki Olive Oil" from 2002 to 2004 and is owner and operator of Eliki Olive Oil, LLC and under the DBA "Aliki's Greek Taverna" from 2004 to the present.  THEODOROPOULOS is an individual and a resident of the County of Los Angeles.  Eliki Olive Oil is a DBA registered under the name of THEODOROPOULOS.  Eliki Olive Oil, LLC is a California registered Limited Liability Company that operates a restaurant under the DBA "Aliki's Greek Taverna" located at 5862 Arbor Vitae St., Los Angeles, California, in the County of Los Angeles.  The restaurant serves customers and prepares prepackaged food that is sold at multiple farmers' markets throughout Los Angeles County.  Eliki Olive Oil, LLC is involved in interstate and foreign commerce.  Eliki Olive Oil, LLC is therefore a citizen of California.  Aliki's Greek Taverna is a DBA registered under Eliki Olive Oil, LLC.

1

2   **Defendant COUNTY**

3       92.   At all times herein, Defendant COUNTY is and was a public entity

4   within the State of California, defined and authorized under the California

5   Constitution and the Charter of the County of Los Angeles and duly organized and

6   existing under and by virtue of the laws of the State of California.

7

8   **Defendant BOARD OF SUPERVISORS OF LOS ANGELES COUNTY**

9       93.   At all times herein, Defendant BOARD OF SUPERVISORS OF LOS

10  ANGELES COUNTY ("COUNTY BOS") is the five member governing board of the

11  COUNTY OF LOS ANGELES, whose five members are voted to their positions by

12  the County's resident voters.  The COUNTY BOS consists of Gloria Molina, Mark

13  Ridley-Thomas, Zev Yaroslavsky, Don Knabe and Michael D. Antonovich.  All these

14  five Los Angeles County Supervisors have shown a significant level of complicity

15  with the corrupt acts of the RICO Defendants that involve the commingling and/or

16  misappropriation of millions of dollars through direct withdrawals from the EH S7K

17  Fund and from EH related revenue that partly belong to Plaintiffs and the illegal and

18  fraudulent depletion of millions of dollars of "surplus" money from the EH S7K

19  Trust Fund in violation of their Fiduciary Duty.  They approved the July 26, 2011

20  amendment or "overhaul" of LACC Title 8 that is clearly based on the presentation of

21  fraudulent and falsified documentation by RICO Defendants FIELDING and

22  BELLOMO and other RICO Defendants and co-conspirators which they knew to be

23  fraudulent and falsified given the fact that they were aware at the time both about the

24  existence of the $20.5 million June 30, 2008 "surplus" and about the concurrent

25  illegal and fraudulent depletion, commingling and/or misappropriation of millions of

26  dollars through direct withdrawals from the EH S7K Fund by Defendant COUNTY,

27  money that was required by the standing 1999 Court Order to be held "in trust" on

28  behalf of Plaintiffs and other businesses and that does not belong to the RICO

Defendant FIELDING, to EH employees, or to Defendants COUNTY and/or COUNTY BOS.  The COUNTY BOS chose to improperly withhold during public hearings held between May 2011 and July 2011 from Plaintiffs and other Los Angeles County based businesses the fact that while these public hearing were taking place that Defendants FIELDING, COUNTY and COUNTY BOS were involved in the concurrent commingling and/or misappropriation of millions of dollars from EH related revenue and that the current fee schedule in effect prior to the July 26, 2011 amendment of LACC Title 8 was more than sufficient to cover EH related expenditures and participated in a scheme along with RICO Defendants FIELDING and BELLOMO and other co-conspirators to further increase EH fees imposed upon Plaintiffs and upon other Los Angeles County businesses fraudulently and through the presentation by the RICO Defendants and acceptance by the COUNTY BOS of falsified documentation in an effort to deceive and defraud Plaintiffs and other Los Angeles County based businesses and participated in a scheme to defraud Plaintiffs and other Los Angeles County based businesses that denied Plaintiffs of their intangible right to honest services in violation of 18 U.S.C. § 1346.  The close association of the COUNTY BOS with the RICO Defendants and their illegal extortion scheme makes the COUNTY BOS susceptible to future charges under the RICO Act pending additional discovery.

**RICO Defendants**

94.    The Defendants listed in paragraphs 95 through 116 are the individuals who have conspired to engage in the pattern of racketeering activity alleged herein, have each committed numerous criminal acts as part of their scheme to defraud, extort, harass, intimidate and retaliate against Plaintiffs, and have each directly participated in the daily operations and/or management of the EH criminal RICO enterprise as it relates to the activities of that enterprise towards Plaintiffs.  These Defendants shall be referred to herein as the "RICO Defendants" and the RICO

Defendants that work directly for EH shall be referred to herein as the "EH RICO Defendants".

95.    At all times relevant hereto, Defendant Jonathan Fielding ("FIELDING") was employed as the Director of the DPH for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County DPH. FIELDING retired from the DPH during 2014.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant FIELDING was responsible for the management of the entire DPH including its EH subdivision and under the authority of Defendant COUNTY.  FIELDING is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.  Exercise of jurisdiction over FIELDING is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

96.    At all times relevant hereto, Defendant Angelo Bellomo ("BELLOMO") was employed as Environmental Health Deputy and was the Director of EH for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant BELLOMO was directly responsible for the management of EH and under the authority of Defendant COUNTY.  BELLOMO is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.  Exercise of jurisdiction over BELLOMO is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

97.    At all times relevant hereto, Defendant Terrance Powell ("POWELL") was employed at various top management positions within EH such as Chief Environmental Health Specialist, as Environmental Health Services Manager, as Director of Environmental Planning & Evaluation and as Acting Director of EH for Defendant COUNTY, acting within his capacity as employee, agent and servant of

the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant POWELL was directly responsible for the management of EH and/or EH units such as Surveillance and Enforcement and the Quality Assurance Division and that acted as the Director of EH during relevant times and under the authority of Defendant COUNTY.  POWELL is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California. Exercise of jurisdiction over POWELL is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

98.   At all times relevant hereto, Defendant Carolyn Watson ("WATSON") was employed as Environmental Health Specialist IV at various management positions within EH for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant WATSON was directly responsible for the filing of falsified and fraudulent criminal charges against Plaintiff THEODOROPOULOS that constitute perjury and that are an integral part of the efforts of the EH criminal racketeering enterprise to extort and coerce Plaintiffs into submission and that committed these illegal acts under the authority of Defendant COUNTY.  WATSON is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.   Exercise of jurisdiction over WATSON is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

99.   At all times relevant hereto, Defendant Nwamaka Oranusi ("ORANUSI") was employed as Chief Environmental Health Specialist and as a Manager of the West District EH Office for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant ORANUSI was directly responsible for the management of EH inspectors

directly involved in the herein alleged racketeering scheme and for the coercion and extortion of Plaintiffs and for the collection of extortionate fees from Plaintiffs under the authority of Defendant COUNTY.  ORANUSI is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.  Exercise of jurisdiction over ORANUSI is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

**100.**  At all times relevant hereto, Defendant Jacqueline Taylor ("TAYLOR") was employed as Environmental Health Services Manager, as Director of District Environmental Services and as Acting Director of EH Food Inspection Bureau for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant TAYLOR was directly responsible for the management of EH inspectors and their immediate supervisors that directly participated in this racketeering scheme and personally engaged in and directed the coercion, extortion and collection of extortionate fees from Plaintiffs and retaliatory attacks against Plaintiffs' restaurant and was intimately involved in the decision to file fraudulent retaliatory charges against Plaintiff THEODOROPOULOS under the authority of Defendant COUNTY.  TAYLOR is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.  Exercise of jurisdiction over TAYLOR is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

**101.**  At all times relevant hereto, Defendant LeTaun Cole Cotton ("COTTON") was employed as Chief Environmental Health Specialist, as Environmental Health Services Manager and as Manager of the West District EH Office for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and

1  based thereon aver, that at all relevant times, Defendant COTTON was directly
2  responsible for the management of EH inspectors that directly participated in this
3  racketeering scheme and personally engaged in along with TAYLOR and directed the
4  coercion, extortion and collection of extortionate fees from Plaintiffs, the retaliatory
5  attacks against Plaintiffs' restaurant and was intimately involved in the decision to
6  file fraudulent retaliatory charges against Plaintiff THEODOROPOULOS under the
7  authority of Defendant COUNTY.  COTTON is an individual residing in the state of
8  California and in the County of Los Angeles, with an intention to reside there
9  indefinitely, and is therefore a citizen of the State of California.   Exercise of
10 jurisdiction over COTTON is reasonable and proper in this District pursuant to 18
11 U.S.C. §1965(a).

12     **102.**   At all times relevant hereto, Defendant Brenda Lopez ("LOPEZ") was
13 employed as Chief Environmental Health Specialist, as Environmental Health
14 Services Manager and as Director of EH Surveillance and Enforcement for Defendant
15 COUNTY, acting within her capacity as employee, agent and servant of the Los
16 Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that
17 at all relevant times, Defendant LOPEZ was directly responsible for the management
18 of EH inspectors that directly participated in this racketeering scheme against
19 Plaintiffs and directed the coercion, extortion and collection of extortionate fees from
20 Plaintiffs under the authority of Defendant COUNTY.   LOPEZ is an individual
21 residing in the state of California and in the County of Los Angeles, with an intention
22 to reside there indefinitely, and is therefore a citizen of the State of California.
23 Exercise of jurisdiction over LOPEZ is reasonable and proper in this District pursuant
24 to 18 U.S.C. §1965(a).

25     **103.**   At all times relevant hereto, Defendant Graceline Shin ("SHIN") was
26 employed as Environmental Health Specialist IV, as Chief Environmental Health
27 Specialist and as Director of EH Quality Assurance for Defendant COUNTY, acting
28 within her capacity as employee, agent and servant of the Los Angeles County EH.

1    Plaintiffs are informed and believe, and based thereon aver, that at all relevant times,
2    Defendant SHIN was directly responsible for the investigation of complaints filed by
3    Plaintiff THEODOROPOULOS with EHQAD concerning the herein alleged
4    racketeering scheme and that she failed to properly investigate and address these
5    complaints and that provided "cover" for the remaining RICO Defendants which
6    resulted in substantial additional damages to Plaintiffs and she engaged in these acts
7    under the authority of Defendant COUNTY.  SHIN is an individual residing in the
8    state of California and in the County of Los Angeles, with an intention to reside there
9    indefinitely, and is therefore a citizen of the State of California.   Exercise of
10   jurisdiction over SHIN is reasonable and proper in this District pursuant to 18 U.S.C.
11   §1965(a).

12       **104.**   At all times relevant hereto, Defendant Patricia Jokas ("JOKAS") was
13   employed as Environmental Health Specialist III, as Environmental Health Specialist
14   IV, as Chief Environmental Health Specialist, as Environmental Health Services
15   Manager and as EH Ombudsman for Defendant COUNTY, acting within her capacity
16   as employee, agent and servant of the Los Angeles County EH.   Plaintiffs are
17   informed and believe, and based thereon aver, that at all relevant times, Defendant
18   JOKAS was directly responsible for the investigation of complaints filed by Plaintiff
19   THEODOROPOULOS with EHQAD concerning the herein alleged racketeering
20   scheme and that she failed to properly investigate and address these complaints and
21   that provided "cover" for the remaining RICO Defendants which resulted in
22   substantial additional damages to Plaintiffs and that she engaged in these acts under
23   the authority of Defendant COUNTY. JOKAS is an individual residing in the state of
24   California and in the County of Los Angeles, with an intention to reside there
25   indefinitely, and is therefore a citizen of the State of California.   Exercise of
26   jurisdiction over JOKAS is reasonable and proper in this District pursuant to 18
27   U.S.C. §1965(a).

28

105. At all times relevant hereto, Defendant Scott Abbott ("ABBOTT") was employed as Environmental Health Specialist III, as Chief Environmental Health Specialist and as EH Program Planning and Development analyst for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant ABBOTT was directly involved or at least partly responsible for the determination and imposition of extortionate EH fees upon Plaintiffs and that he committed these acts under the authority of Defendant COUNTY. ABBOTT is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California. Exercise of jurisdiction over ABBOTT is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

106. At all times relevant hereto, Defendant Obi Ogamba ("OGAMBA") was employed as Chief Environmental Health Specialist, as Environmental Health Services Manager and as a Manager of the East EH District Office located in Burbank and was GRAJEDA's manager from 2009 to the present, acting within her capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant OGAMBA was directly responsible for the management of EH inspectors GRAJEDA and SINGH that were directly involved in the herein alleged racketeering scheme against Plaintiffs and that she directed these illegal acts under the authority of Defendant COUNTY. OGAMBA is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California. Exercise of jurisdiction over OGAMBA is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

107. At all times relevant hereto, Defendant Maria Kharadjian ("KHARADJIAN") was employed as Environmental Health Specialist III, as Chief Environmental Health Specialist and as a Manager at the West District and Burbank

EH District Offices for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH.   Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant KHARADJIAN was directly responsible for the management of EH inspectors directly involved in the herein alleged racketeering scheme and for the coercion, extortion and collection of extortionate fees from of Plaintiffs under the authority of Defendant COUNTY. KHARADJIAN is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.   Exercise of jurisdiction over KHARADJIAN is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

**108.**   At all times relevant hereto, Defendant Verny Grajeda ("GRAJEDA") was employed as Environmental Health Specialist III and as a health inspector for EH and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH.   Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant GRAJEDA was acting as a managing agent or head inspector for farmers' market stands and that he was directly involved in the inspection of Plaintiff's farmers' market stands, that he willfully and knowingly directly participated in the herein alleged racketeering scheme by specifically targeting Plaintiff THEODOROPOULOS and his business for selective prosecution, by issuing falsified inspection reports and falsified violations and hearing notice(s) for permits that were void and not required by law and that he coordinated, instructed and directed other health inspectors to engage and to participate in the herein alleged racketeering scheme against Plaintiffs and that he committed these illegal acts under the authority of Defendant COUNTY.   GRAJEDA is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.   Exercise of jurisdiction over GRAJEDA is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

**109.**   At all times relevant hereto, Defendant Jangbir Singh ("SINGH") was employed as Environmental Health Specialist I, as Environmental Health Specialist II and as a health inspector for EH and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH.   Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant SINGH was directly involved in the inspection of Plaintiff's farmers' market stands, that he willfully and knowingly directly participated in the herein alleged racketeering scheme by specifically targeting Plaintiff THEODOROPOULOS and his business for selective prosecution, by issuing falsified inspection reports and falsified violations and hearing notice(s) for permits that were void and not required by law and that he committed these illegal acts under the authority of Defendant COUNTY.   SINGH is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.   Exercise of jurisdiction over SINGH is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

**110.**   At all times relevant hereto, Defendant Ziad Askar ("ASKAR") was employed as Environmental Health Specialist I, as Environmental Health Specialist II, as Environmental Health Specialist III and as a health inspector for EH and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH.   Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant ASKAR was directly involved in the inspection of Plaintiff's farmers' market stands, that he willfully and knowingly directly participated in the herein alleged racketeering scheme by specifically targeting Plaintiff THEODOROPOULOS and his business for selective prosecution, by issuing falsified inspection reports and falsified violations for permits that were void and not required by law and by repeatedly harassing Plaintiffs at their restaurant and that he committed these illegal acts under the authority of Defendant COUNTY. ASKAR is an individual residing in the state of California and in the County of Los

Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.  Exercise of jurisdiction over ASKAR is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

111.  At all times relevant hereto, Defendant James Daniel ("DANIEL") was employed as Environmental Health Specialist I, as Environmental Health Specialist II and as a health inspector for EH and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant DANIEL was involved in the inspection of Plaintiff's farmers' market stands, that he willfully and knowingly directly participated in the herein alleged racketeering scheme by specifically targeting Plaintiff THEODOROPOULOS and his business for selective prosecution, by issuing falsified inspection reports and falsified violations for permits that were void and not required by law and that he committed these illegal acts under the authority of Defendant COUNTY.   DANIEL is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.  Exercise of jurisdiction over DANIEL is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

112.  At all times relevant hereto, Defendant Ifeoma Ndupu ("NDUPU") was employed as Environmental Health Specialist I, as Environmental Health Specialist II, as Environmental Health Specialist III and as a health inspector for EH and for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant NDUPU was involved in the inspection of Plaintiff's restaurant and farmers' market stands, that she willfully and knowingly directly participated in the herein alleged racketeering scheme by specifically targeting Plaintiff THEODOROPOULOS and his business for selective prosecution, by issuing falsified inspection reports and falsified violations for permits that were

1  void and not required by law and by "neat picking" Plaintiff's restaurant and issuing

2  a "B" grade to the restaurant with the specific intent to harass, intimidate, injure and

3  extort Plaintiffs in their business and that she committed these illegal acts under the

4  authority of Defendant COUNTY. NDUPU is an individual residing in the state of

5  California and in the County of Los Angeles, with an intention to reside there

6  indefinitely, and is therefore a citizen of the State of California. Exercise of

7  jurisdiction over NDUPU is reasonable and proper in this District pursuant to 18

8  U.S.C. §1965(a).

9      113. At all times relevant hereto, Defendant Maristella Yambao

10  ("YAMBAO") was employed as Environmental Health Specialist II, as

11  Environmental Health Specialist III and as a health inspector for EH and for

12  Defendant COUNTY, acting within her capacity as employee, agent and servant of

13  the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon

14  aver, that at all relevant times, Defendant YAMBAO was involved in the inspection

15  of Plaintiff's restaurant and that she willfully and knowingly directly participated in

16  the herein alleged racketeering scheme by specifically targeting Plaintiff

17  THEODOROPOULOS and his business by "neat picking" Plaintiff's restaurant along

18  with NDUPU and issuing a "B" grade to the restaurant with the specific intent to

19  harass, intimidate, injure and extort Plaintiffs in their business and that she committed

20  these illegal acts under the authority of Defendant COUNTY. YAMBAO is an

21  individual residing in the state of California and in the County of Los Angeles, with

22  an intention to reside there indefinitely, and is therefore a citizen of the State of

23  California. Exercise of jurisdiction over YAMBAO is reasonable and proper in this

24  District pursuant to 18 U.S.C. §1965(a).

25      114. At all times relevant hereto, Defendant Maxine Garbutt Ford ("FORD")

26  was employed as Environmental Health Specialist I and as a health inspector for EH

27  and for Defendant COUNTY, acting within her capacity as employee, agent and

28  servant of the Los Angeles County EH. Plaintiffs are informed and believe, and

based thereon aver, that at all relevant times, Defendant FORD was involved in the inspection of Plaintiff's restaurant and farmers' market stands, that she willfully and knowingly directly participated in the herein alleged racketeering scheme under the direction of RICO Defendant GRAJEDA and others by specifically targeting Plaintiff THEODOROPOULOS and his business for selective prosecution, by issuing falsified inspection reports and falsified violations for permits that were void and not required by law and that she committed these illegal acts under the authority of Defendant COUNTY.  FORD is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.  Exercise of jurisdiction over FORD is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

**115.**  At all times relevant hereto, Defendant Rio Enriquez Anyayahan ("ANYAYAHAN") was employed as Environmental Health Specialist I, as Environmental Health Specialist II and as a health inspector for EH and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant ANYAYAHAN was involved in the inspection of Plaintiff's farmers' market stands, that he willfully and knowingly directly participated in the herein alleged racketeering scheme under the direction of RICO Defendant GRAJEDA and others by specifically targeting Plaintiff THEODOROPOULOS and his business for selective prosecution, by issuing falsified inspection reports and falsified violations for permits that were void and not required by law and that he committed these illegal acts under the authority of Defendant COUNTY.  ANYAYAHAN is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.  Exercise of jurisdiction over ANYAYAHAN is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

**116.** At all times relevant hereto, Defendant Joshua Trapesonian ("TRAPESONIAN") was employed as Environmental Health Specialist I, as Environmental Health Specialist II and as a health inspector for EH and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, Defendant TRAPESONIAN was involved in the inspection of Plaintiff's restaurant and that he willfully and knowingly directly participated in the herein alleged racketeering scheme under the direction of other RICO Defendants and/or under his own initiative by issuing falsified inspection reports for the restaurant and by specifically targeting Plaintiff THEODOROPOULOS and by conspiring to have him arrested and imprisoned as part of an effort to enforce the herein alleged racketeering scheme upon Plaintiffs and in an attempt to extort him and his business, to intimidate him and harm him in his person and in his business and that he committed these illegal acts under the authority of Defendant COUNTY. TRAPESONIAN is an individual residing in the state of California and in the County of Los Angeles, with an intention to reside there indefinitely, and is therefore a citizen of the State of California. Exercise of jurisdiction over TRAPESONIAN is reasonable and proper in this District pursuant to 18 U.S.C. §1965(a).

**117.** Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names pursuant to the holdings in *Klinger v. Yamaha Motor Corp., U.S.A.* (E.D. Pa. 1990) 738 F.Supp. 898, 909-10 and *Scheetz v. Morning Call, Inc.* (E.D. Pa. 1990) 130 F.R.D. 34, 36-37. Plaintiffs will amend this Complaint to aver their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon aver that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein averred, and that Plaintiffs' injuries as herein

1   averred were proximately caused by the acts and/or omissions of said fictitiously
2   named Defendants.

3       **118.**   At all times relevant herein, all Defendants and all RICO Defendants and
4   DOES 1 through 10, were agents, employees, representatives and/or consultants of
5   Defendant COUNTY and/or the Los Angeles County DPH, a department and
6   subdivision of Defendant COUNTY, and at all times mentioned herein were acting
7   under color of law, to wit, under the color of the statutes, ordinances, regulations,
8   policies, customs, and usages of Defendant COUNTY.

9       **119.**   At all times relevant herein, all Defendants and all RICO Defendants and
10  DOES 1 through 10 were acting within the course and scope of their employment as
11  agents, employees, representatives and/or consultants of Defendant COUNTY and
12  the Los Angeles County DPH, a department and subdivision of Defendant COUNTY,
13  which is liable in respondent superior pursuant to section 815.2 of the California
14  Government Code.

16  **Non-Party Co-Conspirators**

17      **120.**   Certain other EH employees, a business entity and other non-party
18  individuals played roles, direct or indirect, in the herein alleged scheme to defraud
19  and extort Plaintiffs and retaliate against Plaintiffs.   Foremost among these EH
20  employees, individuals and business entity are the following:

21   a. At all times relevant hereto, William T. Fujioka ("FUJIOKA") was employed as
22      the Chief Executive Officer (CEO) for Defendant COUNTY, acting within his
23      capacity as employee, agent and servant of the Los Angeles County.   Plaintiffs
24      are informed and believe, and based thereon aver, that at all relevant times,
25      FUJIOKA was responsible for the management affairs of Defendant COUNTY,
26      including the overseeing of the DPH and under the authority of Defendant
27      COUNTY.   FUJIOKA on April 16, 2012 wrote a letter that contains numerous
28      inaccurate and misleading statements and makes an effort to support,

fraudulently conceal, cover-up and further the activities of the EH criminal racketeering enterprise.   As a result FUJIOKA has used his position as COUNTY CEO in support and in furtherance of the criminal racketeering activities of the EH RICO enterprise and in an effort to perpetuate these criminal activities against Plaintiffs into the future.   Plaintiffs at this point wish to err on the side of caution and will decide whether or not to charge FUJIOKA in the future as a member of the criminal RICO enterprise pending additional discovery.

b. At all times relevant hereto, Jeremy Cortez ("CORTEZ") was employed as the Chief Financial Officer (CFO) for the DPH and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, CORTEZ was responsible for the management of the financial affairs of the DPH and of the EH S7K Trust Fund and for Defendant COUNTY. According to the EH Inspector Complaint and to certified public accountant James Balbin there is a commingling and/or misappropriation of $27,877,009.45 from the EH S7K Trust Fund which CORTEZ oversees and exercises management upon.   The misappropriation of these funds took place between April 1, 2010 and May 31, 2012.  Plaintiffs believe that there may be additional amounts misappropriated before April 1, 2010 and/or after May 31, 2012 but at this time there has not been an audit for these periods and specific information about possible additional misappropriations is not available to Plaintiffs other than the fact that tens of millions of dollars of EH related revenue seem to be missing from the EH S7K Trust Fund based on conservative estimates and/or knowledge of EH revenues and expenditures during the last few years. CORTEZ has admitted to certified public accountant James Balbin after questioning that Environmental Health related funds were commingled with other County of Los Angeles accounts and/or funds despite the fact that these

1   funds are required to be kept segregated in the EH S7K Trust Fund pursuant to a

2   1999 Court Order and for the protection of Plaintiffs and of other local

3   businesses.  As a result CORTEZ has allowed from his position as DPH CFO the

4   commingling and/or misappropriation of millions of dollars of funds that were

5   required to be held "in trust" by Court Order and that belong in part to Plaintiffs

6   and in whole to Los Angeles County based businesses.  Plaintiffs at this point

7   wish to err on the side of caution and will decide whether or not to charge

8   CORTEZ in the future as a member of the criminal enterprise pending additional

9   discovery.

10   c.  At all times relevant hereto, Richard Vandenberg ("VANDENBERG") was

11   employed as Principal Accountant-Auditor at the Los Angeles County

12   Department of Auditor-Controller for Defendant COUNTY, acting within his

13   capacity as employee, agent and servant of the Los Angeles County.  Plaintiffs

14   are informed and believe, and based thereon aver, that at all relevant times,

15   VANDENBERG was involved with the review of EH rates and fees proposed by

16   EH prior to submission for approval by the COUNTY BOS.  The extent if any of

17   VANDENBERG'S involvement in the EH criminal RICO enterprise and in the

18   extortion of Plaintiffs over a period of more than ten years and to the present

19   time is unknown to Plaintiffs at this time and as a result, he has been excluded

20   from the RICO Defendants pending additional discovery.

21   d.  At all times relevant hereto, Jonathan Freedman ("FREEDMAN") was employed

22   as Chief Deputy Director for the DPH and for Defendant COUNTY, acting

23   within his capacity as employee, agent and servant of the Los Angeles County

24   DPH.  Plaintiffs are informed and believe, and based thereon aver, that at all

25   relevant times, FREEDMAN was involved with the "Fee Study" and in the

26   change of EH's fee structure and possibly with the extortion to which Plaintiffs

27   have been subjected to over the years and under the authority of Defendant

28   COUNTY.  FREEDMAN is currently with L.A. Care Health Plan located at

1055 W. 7th Street, 10th Floor, Los Angeles, CA 90017. Plaintiffs at this point wish to err on the side of caution and will decide whether or not to charge FREEDMAN in the future as a member of the EH criminal RICO enterprise pending additional discovery.

e. At all times relevant hereto, Michele Callaghan ("CALLAGHAN") was employed as Supervising Investigator at the Office of County Investigations that operates within the offices and under the management of the Los Angeles County Auditor-Controller and for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, CALLAGHAN was involved with an investigation concerning the retaliation by the RICO Defendants against Plaintiffs that was initiated by Chris Musella and Mostafani Morteza by an interview of THEODOROPOULOS that took place on Tuesday, June 14, 2011 at the offices of the Los Angeles County Office of County Investigations. The investigation was completed by Chris Musella and a Final Investigative Report was issued by him that is dated June 29, 2012 and that contains specific exculpatory evidence regarding the fabricated, fraudulent and retaliatory criminal charges filed by the RICO Defendants against THEODOROPOULOS. This Final Investigative Report was then turned over by Chris Musella to CALLAGHAN who was the principal investigator and Musella's direct supervisor for final review. CALLAGHAN and Defendant COUNTY have flatly refused to this date to produce this Final Investigative Report despite the fact that it was requested through discovery proceedings in the CCB criminal case pending against THEODOROPOULOS. By these actions, CALLAGHAN and Defendant COUNTY are acting to obstruct the administration of justice by purposely withholding material exculpatory evidence. CALLAGHAN is excluded from the RICO Defendants in this case because she did not have any direct involvement in the extortion of Plaintiffs.

1   CALLAGHAN however is acting to protect the RICO Defendants and
2   Defendant COUNTY that is her employer and may have exercised undue
3   influence on the conclusions of the investigation itself.  Plaintiffs at this point
4   wish to err on the side of caution and will decide whether or not to charge
5   CALLAGHAN in the future as a member of the criminal RICO enterprise
6   pending additional discovery of her action to withhold this important
7   information from discovery and depending on the contents and conclusions of
8   the Final Investigative Report which has not been released to Plaintiffs yet and is
9   improperly withheld by CALLAGHAN and Defendant COUNTY to the present
10  time.

11  f.  At all times relevant hereto, Chris Musella ("MUSELLA") was employed as a
12  Senior Investigator at the Office of County Investigations that operates within
13  the offices and under the management of the Los Angeles County Auditor-
14  Controller and for Defendant COUNTY, acting within his capacity as employee,
15  agent and servant of the Los Angeles County.  Plaintiffs are informed and
16  believe, and based thereon aver, that at all relevant times, MUSELLA was
17  involved with an investigation concerning the retaliation by the RICO
18  Defendants against Plaintiffs that was initiated by MUSELLA and Mostafani
19  Morteza by an interview of THEODOROPOULOS that took place on Tuesday,
20  June 14, 2011 at the offices of the Los Angeles County Office of County
21  Investigations and completed by MUSELLA with the issuance of a Final
22  Investigative Report dated June 29, 2012.  The Final Investigative Report was
23  then turned over by MUSELLA to CALLAGHAN who was the principal
24  investigator and MUSELLA'S direct supervisor at the time for review.
25  CALLAGHAN and Defendant COUNTY have refused to this date to produce
26  this Final Investigative Report despite the fact that it was requested through
27  discovery proceedings in the CCB criminal case pending against
28  THEODOROPOULOS.  There is no reason for Plaintiffs at this point to believe

1   that MUSELLA has anything to do with the activities of the RICO Defendants
2   other than the fact that he was involved in the investigation of their activities
3   which investigation resulted in a Final Investigative Report which is currently
4   being improperly withheld from Plaintiffs by CALLAGHAN and by Defendant
5   COUNTY.

6   g. At all times relevant hereto, Mostafani Morteza ("MORTEZA") was employed
7   as s Senior Investigator at the Office of County Investigations that operates
8   within the offices and under the management of the Los Angeles County
9   Auditor-Controller and for Defendant COUNTY, acting within his capacity as
10   employee, agent and servant of the Los Angeles County. Plaintiffs are informed
11   and believe, and based thereon aver, that at all relevant times, MORTEZA was
12   involved with an investigation concerning the retaliation by the RICO
13   Defendants against Plaintiffs that was initiated by MUSELLA and MORTEZA
14   by an interview of THEODOROPOULOS that took place on Tuesday, June 14,
15   2011 at the offices of the Los Angeles County Office of County Investigations
16   and completed by MUSELLA with the issuance of a Final Investigative Report
17   dated June 29, 2012. The Final Investigative Report was then turned over by
18   MUSELLA to CALLAGHAN who was the principal investigator and
19   MUSELLA'S and MORTEZA'S direct supervisor at the time for review.
20   CALLAGHAN and Defendant COUNTY have refused to this date to produce
21   this Final Investigative Report despite the fact that it was requested through
22   discovery proceedings in the CCB criminal case pending against
23   THEODOROPOULOS. There is no reason for Plaintiffs at this point to believe
24   that MORTEZA has anything to do with the activities of the RICO Defendants
25   other than the fact that he was involved in the investigation of their activities
26   which investigation resulted in a Final Investigative Report which is currently
27   being improperly withheld from Plaintiffs by CALLAGHAN and by Defendant
28   COUNTY.

h. At all times relevant hereto, Tate Bejanyan ("BEJANYAN") was employed as an Attorney for the Office of County Counsel of the Los Angeles County and for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, BEJANYAN has participated in discovery hearings held at Department 2 of the East Los Angeles Superior Court before Judges Upinder S. Karla and Joseph R. Porras in the criminal retaliatory proceedings initiated by the RICO Defendants against THEODOROPOULOS and has conspired to withhold and is improperly withholding to this day from discovery substantial exculpatory evidence that includes email communications, EH inspection reports concerning Plaintiffs' companies, the Final Investigative Report for the investigation performed by the Office of County investigations and other relevant and material exculpatory evidence. BEJANYAN, CALLAGHAN and Defendant COUNTY have flatly refused to this date to produce the Final Investigative Report that was prepared by Defendant COUNTY'S own investigators despite the fact that this was an investigation of the retaliation activities by the RICO Defendants against Plaintiffs, despite the fact that it constitutes material exculpatory evidence for THEODOROPOULOS in the criminal case pending against him and despite the fact that the disclosure of this Final Investigative Report was requested through discovery proceedings in the CCB criminal case pending against THEODOROPOULOS. By these actions, BEJANYAN, CALLAGHAN and Defendant COUNTY are conspiring and acting to obstruct justice by purposely withholding material exculpatory evidence in order to improperly influence through obstruction of the administration of justice the criminal proceedings against THEODOROPOULOS and a related civil case currently pending in federal court against Defendants COUNTY and GRAJEDA as well as the present civil racketeering case. BEJANYAN is excluded from the RICO Defendants in this case because she did

not have any direct involvement in the extortion of Plaintiffs. BEJANYAN however is acting to protect the RICO Defendants and Defendant COUNTY that is her employer through the willful obstruction of the administration of justice while she is an attorney at law and fully aware of her actions and their implications.

i.   At all times relevant hereto, Miles Yakota ("YAKOTA") was employed as Administrative Deputy for the DPH and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County DPH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, YAKOTA oversaw the department within the DPH that calculated the EH fees and oversaw the "Fee Study".  Due to the evidence available at this point that indicates that eight (8) consecutive EH fee increases were imposed on Plaintiffs while there were present large surplus balances in the EH S7K Trust Fund and evidence that indicates that the workloads used in the Fee Study are falsified, incorrect, highly inflated and lead to EH fees that continue to be multiple times higher than the actual cost of inspection, YAKOTA may have played a significant role behind the scenes in the EH criminal RICO enterprise and the repeated extortion of Plaintiffs over a period of more than ten years. Due to the fact that THEODOROPOULOS has never communicated with YAKOTA in the past and due to the fact that his exact role in the conspiracy to extort Plaintiffs is unknown to Plaintiffs at this time, Plaintiffs at this point wish to err on the side of caution and will decide whether or not to charge YAKOTA in the future as a member of the criminal RICO enterprise pending additional discovery.

j.   At all times relevant hereto, Dolores Chavez ("CHAVEZ") was employed as Staff Analyst for EH and for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times,

CHAVEZ was involved in the "Fee Study" and with inappropriate EH fee increases in years prior to the fee study. Due to the evidence available at this point that indicates that eight (8) consecutive EH fee increases were imposed upon Plaintiffs while there were present large surplus balances in the EH S7K Trust Fund and evidence that indicates that the workloads used in the fee study are falsified, incorrect, highly inflated and lead to EH fees that continue to be multiple times higher than the actual cost of inspection, CHAVEZ may have played a significant role in the EH criminal RICO enterprise and the repeated extortion of Plaintiffs over a period of more than ten years. Due to the fact that THEODOROPOULOS has never communicated with CHAVEZ in the past and due to the fact that her exact role in the conspiracy to extort Plaintiffs is unknown to Plaintiffs at this time, Plaintiffs at this point wish to err on the side of caution and will decide whether or not to charge CHAVEZ in the future as a member of the criminal RICO enterprise pending additional discovery.

k. At all times relevant hereto, Kenneth Murray ("MURRAY") was employed as Environmental Health Specialist III, as Chief Environmental Health Specialist, as Director of District Environmental Services and particularly during 2009 and 2010 as Director of Surveillance and Enforcement for EH and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, MURRAY was involved in the management of health inspectors that have been directly involved in the herein alleged racketeering scheme against Plaintiffs and at all times under the authority of Defendant COUNTY. MURRAY has currently retired from EH. Despite his direct knowledge and his admission of the fact that there were serious issues with the way these extortionate and illegal EH fees were imposed and enforced in the past by his predecessors upon Plaintiffs and despite the fact that he was fully aware that the RICO Defendants had retaliated against Plaintiffs during

2008 and 2009 just before he assumed the office of Director of Surveillance and Enforcement he was unable and/or unwilling to make any corrections to these EH fees or to provide relief for Plaintiff THEODOROPOULOS from retaliatory criminal prosecution despite the fact that he was fully aware that THEODOROPOULOS was the victim of the filing of numerous falsified, sham and fraudulent trumped-up criminal charges by the RICO Defendants as part of the herein alleged scheme to defraud. Despite his direct knowledge and admission to THEODOROPOULOS of the fact that THEODOROPOULOS and his business were being victimized by the RICO Defendants MURRAY continued to cooperate with David Sheppard who is the incompetent and unethical Los Angeles Deputy City Attorney that directed, initiated and continues to this day the retaliatory prosecution of THEODOROPOULOS despite the presence of overwhelming evidence of felonious conduct on the part of the RICO Defendants by feeding information to David Sheppard about various meetings that were held with THEODOROPOULOS without disclosing this to THEODOROPOULOS. During MURRAY'S tenor as Director of Surveillance and Enforcement THEODOROPOULOS was arrested and imprisoned for an entire week based on fabricated and fraudulent criminal charges with the direct involvement of RICO Defendant TRAPOSONIAN who was a rather junior and inexperienced health inspector and MURRAY allowed this to take place under his watch and responsibility. MURRAY has been currently excluded from the RICO Defendants because despite the fact that during his service as EH Director of Surveillance and Enforcement the extortion against Plaintiffs continued and THEODOROPOULOS was arrested and imprisoned, it was rather clear to Plaintiffs that he made an effort to manage a very bad situation that he inherited within the highly corrupt Los Angeles County Environmental Health Department and within the constraints that all this placed upon him. He did transfer GRAJEDA and SINGH to the Burbank EH

1  office and he took sole responsibility for the inspection of farmers' market
2  stands from the West District Culver City EH office and redistributed this
3  responsibility to multiple EH District offices which served to somewhat reduce
4  corruption because overtime work was distributed among more health inspectors
5  instead of only a few that took full advantage of that and which was one of the
6  causes of the underlying public corruption and racketeering activity. He did not
7  personally attack Plaintiffs and he did not participate in or directed the
8  imposition of any new extortionate fees upon Plaintiffs although he continued to
9  collect extortionate fees that were already in place when he assumed office.
10 Although he did participate in the conduct of the EH RICO enterprise's affairs
11 by enforcing the payment of extortionate fees that were already imposed upon
12 Plaintiffs by the RICO Defendants he did recognize the fact that the fees were
13 indeed extortionate and that the "Food Demonstrator" permits were
14 unenforceable as he admitted to Plaintiff THEODOROPOULOS. Based on the
15 above, Plaintiffs feel at the present time that MURRAY'S conduct was overall in
16 a positive direction and therefore he has been excluded from the RICO
17 Defendants for this reason, particularly since Plaintiffs do not have any reason to
18 believe that MURRAY conspired to violate the law as the RICO Defendants did.
19 Despite this finding, MURRAY does need and he will be called to testify about a
20 variety of issues including the decision that was made to allow TRAPESONIAN,
21 a junior and inexperienced health inspector to conspire to arrest and imprison Dr.
22 THEODOROPOULOS for a week based on falsified and fabricated retaliatory
23 charges. Depending on the findings and discovery related to these issues a final
24 determination will be made of the exact role that MURRAY played in the herein
25 alleged racketeering scheme.

1. At all times relevant hereto, Babak Tamjid ("TAMJID") was employed as
27 Environmental Health Specialist III, as Environmental Health Specialist IV, as
28 Chief Environmental Health Specialist and as Director of the EH West District

office and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, TAMJID was involved in the management of health inspectors some of whom have been involved in the herein alleged racketeering scheme against Plaintiffs and in the collection of extortionate fees and at all times under the authority of Defendant COUNTY. Despite the fact that during his involvement the extortion by the RICO Defendants against Plaintiffs continued to a great degree and that he collected some of these funds on behalf of the RICO Defendants and the EH criminal RICO enterprise and that he continues to do so to this day, TAMJID has not directly or indirectly participated in the adoption or in the imposition of any of the old extortionate EH fees imposed upon Plaintiffs or of any new extortionate EH fees imposed upon Plaintiffs and there is no reason to believe at this time that he was involved in any of the decisions that were made by the RICO Defendants to illegally set the fees at the levels that these fees were set and to extort Plaintiffs and he has not engaged in the retaliation practices of his predecessors against Plaintiffs. TAMJID is therefore excluded from the RICO Defendants for these reasons.

m. At all times relevant hereto, Victor Abdelmalak ("ABDELMALAK") was employed as Environmental Health Specialist II, as Environmental Health Specialist III and as a health inspector at the EH West District office and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, ABDELMALAK was involved in the inspection of Plaintiffs' restaurant and farmers' market stands and in the occasional collection of extortionate fees from Plaintiffs under the authority of Defendant COUNTY. Despite the fact that during his involvement the extortion by the RICO Defendants against Plaintiffs was in full development and that he

1  collected some of these funds on behalf of the RICO Defendants,
2  ABDELMALAK has not participated in the creation or in the imposition of these
3  extortionate EH fees or of any new EH fees upon Plaintiffs and there is no
4  reason to believe at this time that he was involved in any of the decisions that
5  were made by the RICO Defendants to illegally set the EH fees at the level that
6  these fees were set and with the specific intent to extort Plaintiffs.
7  ABDELMALAK overall has made a noticeable effort to be fair and equitable
8  with Plaintiffs, has inspected repeatedly the Eliki Olive Oil, LLC farmers'
9  market stands and the Aliki's Greek Taverna restaurant without any incidents or
10 problems and has not engaged in the retaliation practices of his colleagues.
11 ABDELMALAK is therefore excluded from the RICO Defendants for these
12 reasons.

13 n. At all times relevant hereto, David Chun ("CHUN") was employed as
14 Environmental Health Specialist I, as Environmental Health Specialist II, as
15 Environmental Health Specialist III and as a health inspector at the EH Northeast
16 District office and for Defendant COUNTY, acting within his capacity as
17 employee, agent and servant of the Los Angeles County EH. Plaintiffs are
18 informed and believe, and based thereon aver, that at all relevant times, CHUN
19 was involved in the inspection of Plaintiffs' farmers' market stands under the
20 authority of Defendant COUNTY. Despite the fact that during his involvement
21 the extortion continued to a great degree and that he tried to enforce at times
22 some of these illegal and extortionate "Sampling Permits" on behalf of the RICO
23 Defendants, there is no indication that CHUN has directed the affairs or the
24 conduct of the EH criminal RICO enterprise against Plaintiffs in any appreciable
25 way. CHUN has inspected repeatedly the Eliki Olive Oil, LLC farmers' market
26 stands without any significant problems and has not engaged in the retaliation
27 practices of his colleagues. CHUN is therefore excluded from the RICO
28 Defendants for these reasons.

o. At all times relevant hereto, Behdis Bagheri ("BAGHERI") was employed as Environmental Health Specialist II, as Environmental Health Specialist III and as a health inspector for EH and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, BAGHERI was directly involved in an incident along with RICO Defendant ASKAR and in an attempt to harass and intimidate Plaintiffs in their business under the authority of Defendant COUNTY. Despite the fact that on July 16, 2008 BAGHERI participated, along with RICO Defendant ASKAR, in one of the many attempts of the EH criminal racketeering enterprise to intimidate Plaintiffs and to harm them in their business and in their reputation by posting a "B" grade at the front door of Aliki's Greek Taverna that was fraudulently imposed by RICO Defendants YAMBAO and NDUPU on June 11, 2008, there is no indication at the present time that BAGHERI has engaged in any additional offensive acts towards Plaintiffs or that has directed or participated in the affairs of the criminal RICO enterprise against Plaintiffs in any appreciable way with the exception of the incident detailed above. BAGHERI will be required to testify concerning the July 16, 2008 incident and depending on the findings of this discovery process he may be subject to racketeering charges particularly if he attempts to "cover up" RICO Defendant ASKAR or anyone else that directed them to engage in the action of July 16, 2008. Plaintiffs wish to err on the side of caution at this time and therefore BAGHERI is presently excluded from the RICO Defendants for the reasons detailed above.

p. At all times relevant hereto, Robert Creviston ("CREVISTON") was employed as Environmental Health Specialist I, as Environmental Health Specialist II and as a health inspector for and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are

1   informed and believe, and based thereon aver, that at all relevant times,
2   CREVISTON was involved in the inspection of Plaintiffs' farmers' market
3   stands under the authority of Defendant COUNTY.  Despite the fact that on
4   February 11, 2012 during an inspection of the North Hollywood farmers' market
5   CREVISTON along with co-conspirator TANEDO made false allegations and
6   issued to Plaintiff THEODOROPOULOS a falsified "Hearing Notice" (a
7   practice that is apparently routine for this highly corrupt public agency) he has
8   no known involvement in the herein alleged extortion scheme by the RICO
9   Defendants against Plaintiffs.  CREVISTON is therefore excluded from the
10   RICO Defendants for this reason.

11   q.  At all times relevant hereto, Elvira Tanedo ("TANEDO") was employed as
12   Environmental Health Specialist I, as Environmental Health Specialist II and as
13   a health inspector for and for Defendant COUNTY, acting within her capacity as
14   employee, agent and servant of the Los Angeles County EH.  Plaintiffs are
15   informed and believe, and based thereon aver, that at all relevant times,
16   TANEDO was involved in the inspection of Plaintiffs' farmers' market stands
17   under the authority of Defendant COUNTY.  Despite the fact that on February
18   11, 2012 during an inspection of the North Hollywood farmers' market
19   TANEDO along with co-conspirator CREVISTON made false allegations and
20   issued to Plaintiff THEODOROPOULOS a falsified "Hearing Notice" (a
21   practice that is apparently routine for this highly corrupt public agency) she has
22   no known involvement in the herein alleged extortion scheme by the RICO
23   Defendants against Plaintiffs.  TANEDO is therefore excluded from the RICO
24   Defendants for this reason.

25   r.  At all times relevant hereto, William Ross ("ROSS") was employed as
26   Environmental Health Specialist IV, as Chief Environmental Health Specialist
27   and as a Manager of the Mid Valley EH District Office located at 6851 Lennox
28   Ave, Suite 305, Van Nuys 9140 and was the supervisor of health inspectors

CREVISTON and TANEDO, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that on February 11, 2012 or shortly thereafter ROSS was involved in an incident concerning inappropriate conduct by CREVISTON and TANEDO under the authority of Defendant COUNTY. Despite the fact that on February 11, 2012 during an inspection of the North Hollywood farmers' market health inspector TANEDO along with co-conspirator CREVISTON that were under the management of ROSS made false allegations and issued to Plaintiff THEODOROPOULOS a falsified "Hearing Notice" (a practice that is apparently routine for this highly corrupt public agency that resembles a "gang") ROSS acted to cover up his subordinates by writing a declaration in which he claims that THEODOROPOULOS talked to him on the phone and became "upset" and he repeated like a parrot, without having direct knowledge of the incident, the false allegation of his two subordinate inspectors by falsely claiming that THEODOROULOS interfered with their inspection of the farmers' market stand. ROSS therefore has "ganged up" with his subordinate inspectors and in support of his inspectors and in the perpetuation of falsehoods despite the fact that he clearly did not have direct knowledge of the incident, which is behavior that is rather typical for this EH criminal racketeering enterprise. Despite all this ROSS has no known direct involvement in the herein alleged extortion scheme by the RICO Defendants against Plaintiffs. ROSS is therefore excluded from the RICO Defendants for this reason.

s. At all times relevant hereto, Okey Nwachuku ("NWACHUKU") was employed as Environmental Health Specialist III and as a health inspector and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, NWACHUKU was involved in the inspection of Plaintiffs' farmers' market stands under the authority of Defendant

COUNTY.   During one of his inspections at the North Hollywood Farmers' Market on June 9, 2012 NWACHUKU failed to issue violations for certain vendor activities alleged by RICO Defendants against Plaintiff THEODOROPOULOS and for which THEODOROPOULOS has been "singled out" and "targeted" by the RICO Defendants for selective prosecution and relentless retaliation.   When later NWACHUKU was questioned by THEODOROPOULOS about this issue, he made an improper sexual gesture towards THEODOROPOULOS and falsely claimed to health inspector Reginio Hough that accompanied him during the inspection but was not there at the time that he was harassed by THEODOROPOULOS.   The whole incident was captured by THEODOROPOULOS on video.   This kind of behavior although unacceptable does not constitute involvement in racketeering and for this reason NWACHUKU is excluded from the RICO Defendants.   This behavior however clearly demonstrates the methods of some Los Angeles County EH inspectors and the mode of operation of the EH criminal RICO enterprise and proves that Plaintiff THEODOROPOULOS has been "specifically targeted" by the RICO Defendants for alleged violations that are never prosecuted or even cited against other farmers' market vendors and the fact that the RICO Defendants actually manufactured crimes and filed multiple fabricated, fraudulent sham retaliatory criminal charges against Plaintiff THEODOROPOULOS in order and with the specific intent to cause harm to him personally and to destroy if possible his small business in an effort to maintain the herein alleged racketeering scheme going.

t.  At all times relevant hereto, Reginio Hough ("HOUGH") was employed as Environmental Health Specialist III, as Environmental Health Staff Specialist and as EH health inspector and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant

times, HOUGH was involved in the inspection of Plaintiffs' farmers' market stands under the authority of Defendant COUNTY.   During one of his inspections at the North Hollywood Farmers' Market on June 9, 2012 HOUGH issued a falsified hearing notice to Plaintiff THEODOROPOULOS and this was captured on video while he made an unsuccessful effort to coerce THEODOROPOULOS to stop videotaping the incident.  This is of importance because it demonstrates precisely the way that these fraudulent hearing notices are issued by Los Angeles County EH inspectors who use these "Hearing Notices" as one of the many tools at their disposal and in order to coerce and extort small businesses.  This kind of behavior although unacceptable and an integral part of the conduct of the EH criminal RICO enterprise, does not on its own constitute involvement in racketeering and for this reason HOUGH is excluded from the RICO Defendants.   This behavior however clearly demonstrates the methods of some Los Angeles County EH inspectors and the mode of operation of the EH criminal RICO enterprise that absolutely hates being videotaped while involved in their dirty work and proves that Plaintiff THEODOROPOULOS has been "specifically targeted" by the RICO Defendants for alleged violations that are never prosecuted or even cited against other farmers' market vendors and the fact that the RICO Defendants actually manufactured crimes and filed multiple fabricated, fraudulent sham retaliatory criminal charges against Plaintiff THEODOROPOULOS in order and with the specific intent to cause harm to him personally and to destroy if possible his small business in an effort to maintain the herein alleged racketeering scheme going.

u. At all times relevant hereto, Kimberly Kennedy Anderson Harris ("HARRIS") was employed as Secretary II at the EH West District office and for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon

aver, that at all relevant times, HARRIS was regularly and frequently involved in the issuance of illegal and extortionist EH permits to Plaintiffs and in the collection of funds derived from extortion on behalf of the EH criminal RICO enterprise and on behalf of the RICO Defendants and under the authority of Defendant COUNTY.  Despite the fact that during her long involvement in that office the extortion continued unabated and that she was the one that often collected the extortionist payments from Plaintiffs and issued the extortionate health permits along with Torr-Ree Jones on behalf of the RICO Defendants, HARRIS has not specifically engaged in any other offensive activities towards Plaintiffs and there is no evidence available to indicate that she had decision-making authority regarding the imposition and collection of these extortionate EH fees or that she directed any of these illegal activities.  She is excluded therefore from the RICO Defendants for this reason.

v. At all times relevant hereto, Torr-Ree Jones ("JONES") was employed as Intermediate Typist-Clerk at the EH West District office and for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH.  Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, JONES was involved in the regular and frequent issuance of illegal and extortionist EH permits to Plaintiffs and in the collection of funds derived from extortion on behalf of the EH criminal RICO enterprise and on behalf of the RICO Defendants and under the authority of Defendant COUNTY.  Despite the fact that during her long involvement in that office the extortion continued unabated and that she was the one that often collected the extortionist payments from Plaintiffs and issued extortionate health permits along with HARRIS on behalf of the RICO Defendants, JONES has not specifically engaged in any other offensive activities towards Plaintiffs and there is no evidence available to indicate that she had decision-making authority regarding the imposition and collection of these extortionate EH fees or that she

1   directed any of these illegal activities.  She is excluded therefore from the RICO

2   Defendants for this reason.

3   w. At all times relevant hereto, Peter Keshishian ("KESHISHIAN") was employed

4   as Environmental Health Specialist II, as Environmental Health Specialist III and

5   as a member of the EH Quality Assurance Department and for Defendant

6   COUNTY, acting within his capacity as employee, agent and servant of the Los

7   Angeles County EH.  Plaintiffs are informed and believe, and based thereon

8   aver, that at all relevant times, KESHISHIAN was involved in the investigation

9   and response to complaints from Plaintiffs as part of his employment with the

10   EH Quality Assurance Department and under the authority of Defendant

11   COUNTY.  Despite the fact that Plaintiffs complained to KESHISHIAN about

12   the extortionate fees and other matters, KESHISHIAN failed to provide straight

13   forward answers regarding the imposition of these extremely high and

14   extortionate fees and as a result it became apparent to Plaintiffs that

15   KESHISHIAN either lacked the authority to criticize the decisions made by his

16   superiors that are named as RICO Defendants in this action or refused to do so

17   and acted to cover up the extortion of Plaintiffs.  As a result of the lack of action

18   by KESHISHIAN and his colleagues at the EH Quality Assurance Department,

19   the extortion of Plaintiffs continued unabated and unchecked for years and

20   eventually resulted in a relentless retaliation campaign against Plaintiffs that

21   further injured Plaintiffs.  KESHISHIAN therefore shares direct responsibility

22   for the extent of the damage that Plaintiffs have suffered due to the racketeering

23   activities of the RICO Defendants that he acted to cover up.  Due to the fact that

24   Plaintiffs believe that KESHISHIAN was employed by EH Quality Assurance

25   but that he was practically unable to confront and/or criticize his superiors

26   because this would affect his employment within EH, he is currently excluded

27   from the RICO Defendants pending additional discovery.  Despite this, he does

28   share responsibility for these developments and as a result KESHISHIAN will be

1   required to offer detailed testimony during these proceeding as a result of his

2   direct involvement in the case and the exact reasons for his failure to address the

3   issue of the extortionate EH fees and may be charged with racketeering

4   violations depending on the results of his testimony.

5   x.   At all times relevant hereto, Elena Stephens ("STEPHENS") was employed as

6   Environmental Health Specialist III, as Environmental Health Staff Specialist

7   and as a member of the EH Quality Assurance Department and for Defendant

8   COUNTY, acting within her capacity as employee, agent and servant of the Los

9   Angeles County EH.   Plaintiffs are informed and believe, and based thereon

10   aver, that at all relevant times, STEPHENS was involved in the investigation and

11   response to complaints from Plaintiffs as part of her employment with the EH

12   Quality Assurance Department and under the authority of Defendant COUNTY.

13   Despite the fact that Plaintiffs complained to STEPHENS about the very high

14   and extortionate fees and other matters, STEPHENS failed to provide straight

15   forward answers regarding the imposition of these extremely high and

16   extortionate EH fees.   As a result, it became apparent to Plaintiffs that

17   STEPHENS either lacked the authority to criticize the decisions made by her

18   superiors that are named as RICO Defendants in this action or refused to do so

19   and acted to cover up the extortion of Plaintiffs.   As a result of the lack of action

20   by STEPHENS and her colleagues at the EH Quality Assurance Department, the

21   extortion of Plaintiffs continued unabated and unchecked for years and

22   eventually resulted in a relentless retaliation campaign against Plaintiffs that

23   further injured Plaintiffs.   STEPHENS therefore shares direct responsibility for

24   the extent of the damage that Plaintiffs have suffered due to the racketeering

25   activities of the RICO Defendants that she acted to cover up.   Due to the fact that

26   Plaintiffs believe that STEPHENS was employed by EH Quality Assurance but

27   that she was practically unable to confront and/or criticize her superiors because

28   this would affect her employment within EH, she is currently excluded from the

RICO Defendants pending additional discovery. Despite this, she does share responsibility for these developments and as a result STEPHENS will be required to offer detailed testimony during these proceeding as a result of her direct involvement in the case and the exact reasons for her failure to address the issue of the extortionate EH fees and may be charged with racketeering violations depending on the results of her testimony.

y.  At all times relevant hereto, Ellen Ruelas ("RUELAS") was employed as Environmental Health Specialist II, as Environmental Health Specialist III and as member of the EH Quality Assurance Department and for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH. RUELAS seems to have left EH during calendar year 2007 and the whereabouts of RUELAS are not currently known to Plaintiffs. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, RUELAS was involved in the investigation and response to complaints from Plaintiffs as part of her employment with the EH Quality Assurance Department and under the authority of Defendant COUNTY. Despite the fact that Plaintiffs complained to RUELAS about the very high and extortionate fees and other matters, RUELAS failed to provide straight forward answers regarding the imposition of these extremely high and extortionate fees. As a result, it became apparent to Plaintiffs that RUELAS either lacked the authority to criticize the decisions made by her superiors that are named as RICO Defendants in this action or refused to do so and acted to cover up the extortion of Plaintiffs. As a result of the lack of action by RUELAS and her colleagues at the EH Quality Assurance Department, the extortion of Plaintiffs continued unabated and unchecked for years and eventually resulted in a relentless retaliation campaign against Plaintiffs that further injured Plaintiffs. RUELAS therefore shares direct responsibility for the extent of the damage that Plaintiffs have suffered due to the racketeering activities of the RICO Defendants that she acted to cover up. Due

to the fact that Plaintiffs believe that RUELAS was employed by EH Quality Assurance but that she was practically unable to confront and/or criticize her superiors because this would affect her employment within EH, she is currently excluded from the RICO Defendants pending additional discovery. Despite this, she does share responsibility for these developments and as a result RUELAS, assuming that she can be located, will be required to offer detailed testimony during these proceeding as a result of her direct involvement in the case and the exact reasons for her failure to address the issue of the extortionate EH fees and may be charged with racketeering violations depending on the results of her testimony.

z. At all times relevant hereto, Gail Morrison ("MORRISON") was employed as Environmental Health Specialist II, as Environmental Health Specialist III, as Chief Environmental Health Specialist and as a member of the EH Quality Assurance Department and for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, MORRISON was involved in the investigation and response to complaints from Plaintiffs as part of her employment with the EH Quality Assurance Department and under the authority of Defendant COUNTY. Despite the fact that Plaintiffs complained to MORRISON about the very high and extortionate fees and other matters, MORRISON failed to provide straight forward answers regarding the imposition of these extremely high and extortionate fees and other matters that she investigated related to Plaintiffs. As a result, it became apparent to Plaintiffs that MORRISON either lacked the authority to criticize the decisions made by her superiors that are named as RICO Defendants in this action or refused to do so and acted to cover up the extortion of Plaintiffs and the continued relentless retaliation of the EH criminal RICO enterprise against Plaintiffs. As a result of the lack of action by MORRISON and her colleagues at the EH Quality

Assurance Department, the extortion of Plaintiffs continued unabated and unchecked for years and eventually resulted in a relentless retaliation campaign against Plaintiffs that further injured Plaintiffs. MORRISON was aware of this retaliation campaign by the RICO Defendants against Plaintiffs and did nothing about it despite the fact that she held the position of "Chief Environmental Health Specialist" at the time which is a relatively high ranking management position within the Environmental Health. MORRISON therefore shares direct responsibility for the extent of the damage that Plaintiffs have suffered due to the racketeering activities of the RICO Defendants that she acted to cover up from her position of responsibility. Due to the fact that Plaintiffs believe that MORRISON was employed by EH Quality Assurance but that she was practically unable to confront and/or criticize her superiors because this would directly affect her employment within EH, she is currently excluded from the RICO Defendants pending additional discovery. Despite this, she does share responsibility for these developments and as a result MORRISON will be required to offer detailed testimony during these proceeding as a result of her direct involvement in the case and the exact reasons for her failure to properly address the issue of the extortionate EH fees and other matters such as her investigation of the conduct of health inspectors NWACHUKU and HOUGH during the June 9, 2012 incident that took place at the North Hollywood farmers' market and particularly given her high ranking within Environmental Health and may be charged with racketeering violations depending on the results of her testimony.

aa. At all times relevant hereto, Veronica Petrosyan ("PETROSYAN") was employed as Environmental Health Specialist I, as Environmental Health Specialist II, as Environmental Health specialist III and as a member of the EH Quality Assurance Department and for Defendant COUNTY, acting within her capacity as employee, agent and servant of the Los Angeles County EH.

Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, PETROSYAN was involved in the investigation and response to complaints from Plaintiffs as part of her employment with the EH Quality Assurance Department and under the authority of Defendant COUNTY. Despite the fact that Plaintiffs complained to PETROSYAN about the very high and extortionate fees and other matters, PETROSYAN failed to provide straight forward answers regarding the imposition of these extremely high and extortionate fees.    As a result, it became apparent to Plaintiffs that PETROSYAN either lacked the authority to criticize the decisions made by her superiors that are named as RICO Defendants in this action or refused to do so and acted to cover up the extortion of Plaintiffs.  As a result of the lack of action by PETROSYAN and her colleagues at the EH Quality Assurance Department, the extortion of Plaintiffs continued unabated and unchecked for years and eventually resulted in a relentless retaliation campaign against Plaintiffs that further injured Plaintiffs.  PETROSYAN was aware of this retaliation campaign by the RICO Defendants against Plaintiffs and did nothing about it. PETROSYAN therefore shares direct responsibility for the extent of the damage that Plaintiffs have suffered due to the racketeering activities of the RICO Defendants that she acted to cover up.  Due to the fact that Plaintiffs believe that PETROSYAN was employed by EH Quality Assurance but that she was practically unable to confront and/or criticize her superiors because this would affect her employment within EH, she is currently excluded from the RICO Defendants pending additional discovery.    Despite this, she does share responsibility for these developments and as a result PETROSYAN will be required to offer detailed testimony during these proceeding as a result of her direct involvement in the case and the exact reasons for her failure to address the issue of the extortionate EH fees and may be charged with racketeering violations depending on the results of her testimony.

bb. At all times relevant hereto, Iduve Hernandez ("HERNANDEZ") was employed as Environmental Health Specialist II and as Environmental Health Specialist III, and for Defendant COUNTY, acting within his capacity as employee, agent and servant of the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that HERNANDEZ was involved along with RICO Defendant TRAPESONIAN in the arrest and imprisonment for a week of Plaintiff THEODOROPOULOS based on falsified criminal charges. Since his involvement was secondary to that of TRAPOSONIAN, HERNANDEZ has been currently excluded from the RICO Defendants but will be required to offer testimony regarding this incident and depending on additional discovery may be charged with conspiring to actively further the racketeering scheme against Plaintiffs and to injure Plaintiffs in their business.

cc. At all times relevant hereto, Armando Saavedra ("SAAVEDRA") was employed as code enforcement officer for and the City of Calabasas, acting within his capacity as employee, agent and servant of the City of Calabasas. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, SAAVEDRA was involved in code compliance inspections at the Calabasas farmers' market and under the authority of the City of Calabasas. Despite the fact that on July 30, 2011 during an incident involving RICO Defendants GRAJEDA and SINGH and Plaintiff THEODOROPOULOS at the Calabasas farmers' market where these two highly corrupt health inspectors attempted once again to extort Plaintiffs, SAAVEDRA took the side of the RICO Defendants and offered an affidavit in support of the criminal prosecution of THEODOROPOULOS, he has no known involvement in the herein alleged extortion scheme by the RICO Defendants against Plaintiffs. SAAVEDRA is therefore excluded from the RICO Defendants for this reason but he will be required to offer testimony regarding the July 30, 2011 and the affidavit that he offered in support of the criminal prosecution of THEODOROPOULOS and if it

1    determined through his testimony that he acted to actively support and aid the
2    criminal racketeering activities of RICO Defendants GRAJEDA and SINGH he
3    and his employer may be charged with conspiracy to actively support the herein
4    alleged racketeering scheme against Plaintiffs.

5    dd. At all times relevant hereto, Steve Napolitano ("NAPOLITANO") was employed
6    as an assistant for fourth district (where Plaintiff THEODOROPOULOS resides)
7    Los Angeles County Supervisor Don Knabe and for Defendant COUNTY, acting
8    within his capacity as employee, agent and servant of the Los Angeles County.
9    Plaintiffs are informed and believe, and based thereon aver, that at all relevant
10   times, NAPOLITANO was involved in the representation of Supervisor Knabe
11   and under the authority of Defendant COUNTY.   Despite the fact that
12   NAPOLITANO     was     informed     early     on     directly     by     Plaintiff
13   THEODOROPOULOS via repeated emails about the extremely high EH fees
14   that his company was subjected to by the RICO Defendants and the practically
15   daily intimidation and the harassment to which Plaintiffs were subjected to at the
16   time by the RICO Defendants as part of the herein alleged criminal racketeering
17   scheme, NAPOLITANO failed to provide relief or to correct the problem, which
18   in turn resulted in a relentless retaliation campaign by the RICO Defendants
19   against Plaintiffs that continues to the present time and that has further injured
20   Plaintiffs in their business.   Despite NAPOLITANO'S failure to exercise any
21   form of leadership as the appointed assistant of COUNTY Supervisor Knabe,
22   there are no reasons at this point to believe that NAPOLITANO directly
23   participated or financially benefited from the herein alleged extortion scheme by
24   the RICO Defendants against Plaintiffs.   NAPOLITANO is therefore excluded
25   from the RICO Defendants for this reason.   NAPOLITANO however will be
26   required to offer testimony regarding the reasons for his actions and for his
27   failure and the failure of Supervisor Knabe that he represents to address the
28   extensive public corruption that has taken hold of the Los Angeles County

1   Environmental Health Department and the conversion of this public agency by
2   certain individuals employed by EH and by the DPH into a criminal racketeering
3   enterprise with their personal financial gain as their sole motivation.

4   ee. At all times relevant hereto, Yolanda Vera ("VERA") was employed as an
5   assistant for second district (where Plaintiffs' business is located) Los Angeles
6   County Supervisor Mark Ridley-Thomas and for Defendant COUNTY, acting
7   within her capacity as employee, agent and servant of the Los Angeles County.
8   Plaintiffs are informed and believe, and based thereon aver, that at all relevant
9   times, VERA was involved in the representation of Supervisor Thomas and
10  under the authority of Defendant COUNTY. Despite the fact that VERA was
11  informed as early as May 22, 2009 directly by Plaintiff THEODOROPOULOS
12  about the extremely high EH fees that his company was subjected to by the
13  RICO Defendants as well as about the practically daily intimidation and the
14  harassment to which Plaintiffs were subjected to at the time by the RICO
15  Defendants as part of the herein alleged criminal racketeering scheme, VERA
16  failed to provide relief or to correct the problem, which in turn resulted in a
17  relentless retaliation campaign by the RICO Defendants against Plaintiffs that
18  continues to the present time and that has further injured Plaintiffs in their
19  business. Despite the fact that VERA failed to address the issue as the appointed
20  assistant to Supervisor Mark Ridley-Thomas for matters related to the DPH and
21  to EH, there is no indication at this time that VERA had direct involvement in
22  the herein alleged extortion scheme by the RICO Defendants against Plaintiffs.
23  VERA is therefore excluded from the RICO Defendants for this reason. VERA
24  will be required however to offer testimony during these proceeding as a result
25  of the many email and/or phone communications and meeting(s) that she and her
26  assistant Salya Mohamedy had with Plaintiff THEODOROPOULOS about
27  conduct alleged in this Complaint and about her failure and the failure of
28  Supervisor Mark Ridley-Thomas that she represents to address the extensive

1    public corruption that has taken hold of the Los Angeles County Environmental

2    Health Department and the conversion of this public agency by certain

3    individuals employed by EH or by the DPH into a criminal racketeering

4    enterprise with their personal financial gain as their sole motivation.

5    ff.  At all times relevant hereto, Salya Mohamedy ("MOHAMEDY") was employed

6    as an assistant for second district (where Plaintiffs' business is located) Los

7    Angeles County Supervisor Mark Ridley-Thomas, under the supervision of

8    VERA and for Defendant COUNTY, acting within her capacity as employee,

9    agent and servant of the Los Angeles County.  Plaintiffs are informed and

10   believe, and based thereon aver, that at all relevant times, MOHAMEDY was

11   involved in the representation of Supervisor Mark Ridley-Thomas and under the

12   authority of Defendant COUNTY.  Despite the fact that MOHAMEDY was

13   informed as early as May 22, 2009 directly by Plaintiff THEODOROPOULOS

14   about the very high EH fees that were imposed by the RICO Defendants on his

15   business as well as about the practically daily intimidation and the harassment to

16   which Plaintiffs were subjected to at the time by the RICO Defendants as part of

17   the herein alleged criminal racketeering scheme,  MOHAMEDY failed along

18   with VERA to provide relief for Plaintiffs or to properly address or correct the

19   problem, which in turn resulted in a relentless retaliation campaign by the RICO

20   Defendants against Plaintiffs that continues to the present and that further

21   injured Plaintiffs in their business.  Despite the fact that MOHAMEDY failed to

22   address the issue as the appointed assistant to Supervisor Mark Ridley-Thomas

23   and VERA for matters related to the DPH and to EH, there is no indication at

24   this time that MOHAMEDY had direct involvement in the herein alleged

25   extortion scheme by the RICO Defendants against Plaintiffs.  MOHAMEDY is

26   therefore excluded from the RICO Defendants for this reason.  MOHAMEDY

27   will be required however to offer testimony during these proceeding as a result

28   of the many email and/or phone communications and meeting(s) that she and/or

1    her direct supervisor VERA had with Plaintiff THEODOROPOULOS about

2    conduct alleged in this Complaint and about her failure and the failure of

3    Supervisor Mark Ridley-Thomas that she represents to address the extensive

4    public corruption that has taken hold of the Los Angeles County Environmental

5    Health Department and the conversion of this public agency by certain

6    individuals employed by EH and by the DPH into a criminal racketeering

7    enterprise with their personal financial gain as their sole motivation.

8    gg.At all times relevant hereto, MGT of America Inc. ("MGT") was a private

9    consulting corporation with its headquarters in Tallahassee Florida and regional

10    offices in Sacramento California, Austin Texas, Olympia Washington and Bay

11    City Michigan acting within its capacity as employee, agent, consultant and

12    expert for Defendant COUNTY and for the Los Angeles County EH.  The firm

13    specializes in public sector consulting and cost analysis and they were involved

14    in the preparation of the supposedly independent "Fee Study" based on which

15    the entire Los Angeles County Title 8 was amended and practically "overhauled"

16    on July 26, 2011.  This July 26, 2011 amendment of LACC Title 8 was very

17    extensive and for this reason is considered as an "overhaul" of the entire LACC

18    Title 8 that specifies all EH related fees that all businesses in Los Angeles

19    County are required to pay to EH each and every year.  This "overhaul" of

20    LACC Title 8 resulted in an increase in the fees collected by EH from Los

21    Angeles County based businesses from $69 million per year according to

22    FIELDING or from $77 million per year according to the James Balbin

23    accounting report to $82.4 million per year according to FIELDING or to

24    $96,074,431 according to Plaintiffs' estimates, which represents a rather

25    substantial increase of 19.42% in the total fees collected each and every year by

26    the EH.  The problem with all this is that the "Fee Study" that MGT authored

27    and certified as "accurate" and the EH RICO Defendants presented as

28    "Independent" was neither independent nor accurate because it is based on

fraudulent inflated workload schedules provided to MGT by EH staff that were not checked for accuracy by MGT or any other independent third party and because it contained definitions for "temporary food booths" that are non-conforming with the requirements of state law for Temporary Food Facilities (TFFs). Despite the fact that these workload estimates are fudged, falsified, highly inflated and cannot stand-up to scrutiny, and that the definitions included in the Fee Study for "temporary food booths" are non-conforming with state law, MGT used them to calculate the fees that Plaintiffs and other business in Los Angeles County have to pay from July 1, 2011 forward and to the present time, thus directly injuring Plaintiffs and other local businesses. MGT therefore colluded with the RICO Defendants, with EH and with Defendant COUNTY to present a "Fee Study" that was neither independent, nor accurate and that contained false information these acts by MGT have caused and continue to cause substantial damages to Plaintiffs in their business. As a result, MGT's employees that were directly or indirectly involved in the preparation of the "Fee Study" will be required to offer detailed discovery and testimony during these proceeding as a result of the continual investigation into the racketeering activities alleged in this complaint and MGT's direct involvement with the "Fee Study" that has adversely affected Plaintiffs and that has been used by the RICO Defendants as a tool in an effort to legitimize, legalize and perpetuate the extortion of Plaintiffs into the future. Depending on the results of further investigation, MGT may be named as a private party co-conspirator to the herein alleged criminal racketeering scheme.

hh. At all times relevant hereto, Brad Burgers ("BURGERS") was employed as cost analyst for MGT, acting within his capacity as employee, agent, consultant and expert for Defendant COUNTY and for the Los Angeles County EH. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, BURGERS was involved in the preparation of the Fee Study and under the

employment of MGT that was contracted by Defendant COUNTY for this purpose. For the reasons outlined above, BURGERS will be required to testify during these proceeding as a result of the continual investigation into the racketeering activities alleged in this Complaint and MGT's direct involvement with the Fee Study that has adversely affected Plaintiffs in their business and that has been used by the RICO Defendants as a tool in an effort to legitimize, legalize and perpetuate the extortion of Plaintiffs into the future.

ii.   At all times relevant hereto, David Sheppard ("SHEPPARD") was employed as a Deputy City Attorney for the City of Los Angeles, acting within his capacity as an employee of the City of Los Angeles. Plaintiffs are informed and believe, and based thereon aver, that at all relevant times, SHEPPARD was involved in the preparation and filing of at least fifty (50) sham, fraudulent and retaliatory criminal counts against THEODOROPOULOS based on complaints filed with his office by the RICO Defendants. Plaintiffs are also informed, believe and based thereon aver that SHEPPARD failed to perform even a basic investigation or due diligence on the validity or lack thereof of the charges that he filed against THEODOROPOULOS. SHEPPARD went ahead and filed fifty (50) criminal counts against THEODOROPOULOS, eleven of which are for "sampling permits" that not only were not required by law and represented simply an attempt by the RICO Defendants to further extort Plaintiffs but that were void and expressly prohibited by law because they were way in excess of the actual cost of inspection and that were adopted, implemented and imposed illegally by the RICO Defendants upon Plaintiffs. SHEPPARD did not even bother to check the law before filing these multiple criminal charges against THEODOROPOULOS but instead, took the word of the RICO Defendants at phase value. SHEPPARD therefore filed numerous criminal charges against THEODOROPOULOS that are completely devoid of legal and factual basis. SHEPPARD also planned and directed the prosecution of

THEODOROPOULOS at an early stage by specifically directing the RICO Defendants to "target" THEODOROPOULOS and his business, to ambush Plaintiffs' farmers' market stands and to use cameras to take as many pictures as possible in an attempt to substantiate and manufacture criminal charges out of thin air. SHEPPARD was therefore directly and intimately involved in the planning, manufacturing and filing of the fraudulent and sham criminal charges against THEODOROPOULOS and has shown utter incompetence and a profound disregard for the rule of law for a man that has been sworn to uphold the law and for a licensed attorney at law. As a result of his illegal actions, SHEPPARD has been unable to successfully prosecute the fraudulent fifty-count CCB case that dates back to early 2009 to the present day. At the present time SHEPPARD and his direct supervisor and Los Angeles City Attorney Mike Feuer continue to improperly maintain these falsified retaliatory criminal charges against THEODOROPOULOS, thus maliciously prosecuting THEODOROPOULOS, despite the fact that they are fully aware at this point that these are fraudulent retaliatory charges filed by the RICO Defendants as part of the herein alleged elaborate racketeering scheme. SHEPPARD and FUER maintain these falsified criminal charges against THEODOROPOULOS in the hope to obtain a conviction of THEODOROPOULOS on one or more of these criminal charges or in the hope to force a deal upon THEODOROPOULOS so that they can mitigate civil liability for the RICO Defendants, for Defendant COUNTY and for the City of Los Angeles that has falsely imprisoned and maliciously prosecuted THEODOROPOULOS without doing any due diligence and as a result of negligence by SHEPPARD. SHEPPARD is therefore acting in bad faith and in a manner that is highly unethical and in violation of ethical and legal principles that are expected to be upheld by attorneys and by prosecutors in particular whose job is to seek the truth and not to attack innocent citizens that are the victims of racketeering in order to cover up their own mistakes and/or

1    negligence. SHEPPARD was not involved directly or indirectly in the extortion

2    of large sums of money from Plaintiffs. His lack of legal competence and ethical

3    conduct however has resulted in fifty (50) criminal counts filed against

4    THEODOROPOULOS in early 2009 that are devoid of factual and legal basis

5    and have been maintained to the present time in the form of a malicious

6    prosecution against THEODOROPOULOS. This incompetent and unethical

7    conduct and negligence by SHEPPARD has resulted in substantial damages for

8    THEODOROPOULOS and for his business.

9   jj. At all times relevant hereto, Carmen Trutanich ("TRUTANICH") was elected

10    and employed as a City Attorney for the City of Los Angeles, acting within his

11    capacity as an employee of the City of Los Angeles. Plaintiffs are informed and

12    believe, and based thereon aver, that at all relevant times, TRUTANICH was

13    involved in the maintenance of at least fifty (50) sham, fraudulent and retaliatory

14    criminal counts against THEODOROPOULOS that were filed by SHEPPARD

15    for his entire four-year term as Los Angeles City Attorney. Plaintiffs are also

16    informed, believe and based thereon aver that THEODOROPOULOS met

17    TRUTANICH at a community event that took place at the Greek church of St.

18    Katherine located in Redondo Beach during 2011 where TRUTANICH admitted

19    to THEODOROPOULOS after THEODOROPOULOS complained to him that

20    his office maintained against him fifty (50) fraudulent criminal counts that "[h]e

21    had 500 attorneys under him and that he was not aware what they were doing",

22    that "[t]hey did not do any due diligence [at the Los Angeles City Attorney's

23    Office] when they receive cases from the police or from the health department"

24    and that "[i]f THEODOROPOULOS wished to communicate with him, that he

25    should not send his letters to his Los Angeles City Attorney's office downtown,

26    but give them instead to Alex [Tsiboukas]". Alex Tsiboukas is a Greek

27    restaurant owner and a contributor to TRUTANICH'S failed campaigns to be

28    elected as Los Angeles County District Attorney and to be re-elected as Los

Angeles City Attorney and an acquaintance of THEODOROPOULOS for many years.   Practically immediately after the incident at the Greek Church, TRUTANICH sent to Plaintiffs' restaurant a Greek Attorney named Theodore J. Batsakis who is a close friend of TRUTANICH as he indicated to THEODOROPOULOS.  Batsakis did not reveal to THEODOROPOULOS at the time that he was sent by TRUTANICH to "settle" the fifty-count CCB criminal case against THEODOROPOULOS with the City of Los Angeles and instead claimed that he was sent by Alex Tsiboukas.   Alex Tsiboukas later however revealed to THEODOROPOULOS that it was TRUTANICH that sent Batsakis to the restaurant owned and operated by THEODOROPOULOS in order to "take care of the case" as Tsiboukas said.  Batsakis visited the restaurant three times and spoke to THEODOROPOULOS and repeatedly offered his assistance with the fifty-count CCB criminal case against THEODOROPOULOS while disclosing his close friendship with TRUTANICH in order to entice THEODOROPOULOS to hire him but without disclosing the fact that Trutanich was the one that sent him in the first place. THEODOROPOULOS rejected the offer by Batsakis to help with the CCB criminal case specifically due and because of his close association with TRUTANICH.   Despite the fact that TRUTANICH was made aware of the fraudulent nature of the case both directly by THEODOROPOULOS during their 2011 meeting at the Greek church and by at least two detailed letters that were mailed to TRUTANICH by THEODOROPOULOS and given to Alex Tsiboukas as well per TRUTANICH'S twisted instructions, TRUTANICH refused to unconditionally withdraw the fraudulent criminal charges against THEODOROPOULOS, which led to THEODOROPOULOS openly and public challenging TRUTANICH during the elections for DA and for City Attorney for using his public office to support and protect criminal racketeering activities, a charge that TRUTANICH refused to address and did not refute at the time despite the fact that he was hurting for

1    votes in both elections and he eventually lost both elections with substantial

2    margins which effectively finished his sorry and rather short political career.  It

3    was later determined by THEODOROPOULOS that TRUTANICH also received

4    substantial campaign contributions and that has a close relationship with

5    Criminal Defense Attorney Mark Geragos as well that was hired by

6    THEODOROPOULOS to represent him in the CCB and Malibu criminal cases.

7    THEODOROPOULOS was not aware of the existence of this conflict of interest

8    because it was not disclosed by Mark Geragos at the time that he was hired to

9    defend THEODOROPOULOS.   TRUTANICH therefore did not only refuse to

10   unconditionally   withdraw   the   fraudulent   CCB   criminal   case   against

11   THEODOROPOULOS as he had an obligation to do, but he secretly and

12   repeatedly interfered with the criminal defense attorneys or prospective criminal

13   defense attorneys of THEODOROPOULOS and even tried to have his close

14   friend Batsakis hired by THEODOROPOULOS without disclosing that he was

15   the one that sent Batsakis to THEODOROPOULOS in the first place.

16   TRUTANICH was not involved directly or indirectly in the extortion of large

17   sums of money from Plaintiffs.   His lack of ethical conduct however while

18   acting under the employment and on behalf of the City of Los Angeles has

19   resulted in the improper maintenance of fifty (50) fraudulent criminal counts that

20   are devoid of factual and legal basis against THEODOROPOULOS for the entire

21   four (4) years of his tenure at the Los Angeles City Attorney's Office which has

22   resulted in substantial damages for THEODOROPOULOS and for his business.

23   kk. At all times relevant hereto, Mike Feuer ("FEUER") was elected and employed

24      as a City Attorney for the City of Los Angeles, acting within his capacity as an

25      employee of the City of Los Angeles.   FEUER defeated TRUTANICH in the

26      election for Los Angeles City Attorney on May 21, 2013 and assumed

27      responsibilities as Los Angeles City Attorney on July 1, 2013.   Plaintiffs are

28      informed and believe, and based thereon aver, that at all relevant times, FEUER

was involved in the maintenance of at least fifty (50) sham, fraudulent and retaliatory criminal counts against THEODOROPOULOS that were filed by SHEPPARD in early 2009 much before the election and employment of FEUER by the City of Los Angeles as City Attorney. During the campaigns for the two elections that took place for Los Angeles City Attorney THEODOROPOULOS directly and openly opposed TRUTANICH because he refused to unconditionally drop the fifty (50) sham, fraudulent and trumped-up criminal counts against THEODOROPOULOS that SHEPPARD had filed without doing any due diligence.    In his efforts to oppose the election of TRUTANICH, THEODOROPOULOS contacted FEUER on the phone and offered to help him to win the election.    During that phone conversation FEUER told THEODOROPOULOS "what I need now is money".    THEODOROPOULOS explained to FEUER at that time that the reason that he was opposing TRUTANICH was because of an open criminal case that he had where he was improperly accused of fifty (50) crimes and which TRUTANICH refused to unconditionally withdraw despite the fact that he was aware that the case was without merit.  FEUER then told THEODOROPOULOS "I understand how you feel, I hear it in your voice".  Based on the disclosure of THEODOROPOULOS that he had an open pending criminal case with the Los Angeles City Attorney's Office, FEUER indicated to THEODOROPOULOS that he could not take money from THEODOROPOULOS for this reason, something that THEODOROPOULOS was also in agreement.    During both campaigns, THEODOROPOULOS talked to many of his customers throughout Los Angeles and asked them to support Mike Feuer in both elections for City Attorney and although he did not contribute to the Mike Feuer campaign financially, he did contribute substantially and in terms of votes because he took the time to speak to many citizens about this issue.  After FEUER was elected as Los Angeles City Attorney, he was repeatedly informed by THEODOROPOULOS about the lack

of merit of the criminal case pending against THEODOROPOULOS and the extensive public corruption and racketeering activities associated with the case and detailed herein. Despite, the fact that FEUER has been fully aware of these facts however even before his election to the Los Angeles City Attorney's Office, he has refused to unconditionally withdraw the case as he has an obligation to do and instead has been offering various "deals" to THEODOROPOULOS, the latest of which was to drop all pending criminal charges against THEODOROPOULOS if THEODOROPOULOS agrees to have his company, Eliki Olive Oil, LLC plead "No Contest" to one misdemeanor for a damaged utensil or some other minor violation, all in an effort by FEUER to shield and protect the RICO Defendants and Defendant COUNTY and the City of Los Angeles from civil liability at the expense of Plaintiff THEODOROPOULOS. FEUER is therefore acting in bad faith and in a manner that is unethical and in violation of legal and ethical principles that are expected to be upheld by attorneys and by prosecutors in particular whose job is to seek the truth and not to attack innocent citizens that are the victims of racketeering in order to cover up their own mistakes and negligence. FEUER was not involved directly or indirectly in the extortion of large sums of money from Plaintiffs. His lack of ethical conduct however while acting under the employment and on behalf of the City of Los Angeles has resulted in the improper maintenance of fifty (50) fraudulent criminal counts that are devoid of factual and legal basis against THEODOROPOULOS from July 1, 2013 that he assumed office as Los Angeles City Attorney and to the present, which has resulted and continues to result in substantial damages for THEODOROPOULOS and for his business.

ll. At all times relevant hereto, Mark Geragos ("GERAGOS") of the criminal defense firm Geragos & Geragos was hired by THEODOROPOULOS as his criminal defense attorney and tasked to defend THEODOROPOULOS' interests in the Malibu and the CCB criminal cases that were filed against